# 24-776

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

—◆◆◆●◆◆◆—

WILDLIFE PRESERVES, INC.,

*Plaintiff-Appellant,*

ANIMAL WELFARE INSTITUTE,

*Plaintiff,*

-against-

ALEXCY ROMERO, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF
FIRE ISLAND NATIONAL SEASHORE, THE UNITED STATES NATIONAL
PARK SERVICE, AN AGENCY OF THE U.S. DEPARTMENT OF THE
INTERIOR, UNITED STATES OF AMERICA,

*Defendants-Appellees.*

*On appeal from Order and Judgment of the U.S.
District Court for the Eastern District of New York*

## BRIEF FOR PLAINTIFF-APPELLANT AND SPECIAL APPENDIX

**MEYNER & LANDIS, LLP**
1 Gateway Center, Suite 2500
Newark, New Jersey 07102
(973) 602-3423
By: Catherine Pastrikos, Esq.
*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS-BRIEF

*Page*

TABLE OF CONTENTS-SPECIAL APPENDIX .......................................................iii

TABLE OF AUTHORITIES ................................................................................. iv

I.    PRELIMINARY STATEMENT ........................................................... 1

II.   JURISDICTIONAL STATEMENT ..................................................... 3

III.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................... 3

IV.   STATEMENT OF THE CASE .......................................................... 4

      A. Factual Background ................................................................. 5

      B. Procedural History ................................................................ 11

          1.  Plaintiff's claims................................................................ 11

          2.  The District Court's dismissal of the action .......................... 12

V.    SUMMARY OF THE ARGUMENT ................................................... 13

VI.   STANDARD OF REVIEW .............................................................. 16

VII.  LEGAL ARGUMENT IN SUPPORT OF APPELLANT'S APPEAL ............ 18

      A. The District Court Committed Reversible Error When It Determined
         Plaintiff's QTA Claim Falls Outside Of The 12-Year Statute Of
         Limitations ......................................................................... 18

          1.  Plaintiff's claims are timely because the 12-year statute of
              limitations began running in 2016 ........................................ 18

          2.  Plaintiff did not have a reasonable awareness in 1988 that the
              1967 fence was adverse to its interest ................................... 24

          3.  Defendants abandoned the claim that the Superintendent's
              reference to the 1967 fence during *Allen v. Hodel* triggered the
              statute of limitations ........................................................ 26

4. Even if Plaintiff violated the statute of limitations relating to the 1967 fence, Plaintiff is nevertheless entitled to bring another QTA claim against Defendants relating to the 2016 Plan because it is a separate issue. ........................................................................ 28

5. The Court should reverse because the District Court's ruling would have a chilling effect on land donations to the NPS ................... 31

B. Defendants Violated The Deed Restrictions When NPS Issued The ROD, Triggering Plaintiff's Reversionary Interest In The Tracts .............. 32

1. Plaintiff has a possibility of reverter on the Tracts ................................ 32

2. The United States holds a "fee on limitation" in the Tracts ................. 36

3. The 2016 ROD and Plan violated the deed restrictions ......................... 37

C. Plaintiff Was Entitled To Summary Judgment On Its Claims ................... 41

1. There is no genuine dispute of material fact on Plaintiff's Declaratory Judgment claim .................................................................... 41

2. There is no genuine dispute of material fact on Plaintiff's QTA claim ................................................................................................... 43

3. There is no genuine dispute of material fact on Plaintiff's Permanent Injunction claim ..................................................................... 46

CONCLUSION ............................................................................................. 49

CERTIFICATE OF COMPLIANCE ...................................................... 50

## TABLE OF CONTENTS-SPECIAL APPENDIX

**ORDERS AND JUDGMENTS:**

Memorandum and Order on MSJ, Hon. Ramón E. Reyes, Jr., U.S.D.J. (Feb. 20, 2024) ..................................................................................................SA.1

Clerk's Judgment (Feb. 28, 2024) ..........................................................SA.25

**STATUTES:**

16 U.S.C. § 459e ....................................................................................SA.26

28 U.S.C. § 2409a ..................................................................................SA.27

42 U.S.C. §§ 4321 ..................................................................................SA.30

N.Y. Envtl. Conserv. Law § 11-0103 .....................................................SA.31

TABLE OF AUTHORITIES

**CASES:**

*Allen v. Hodel*, 1989 WL 8143 (E.D.N.Y. 1998) ..................................................*passim*

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ........................................ 46

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 18

*Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067 (2d Cir. 1993) ............................. 18

*Bankers Trust v. Rhoades*, 859 F.2d 1096, (2d Cir. 1988) ......................................... 29

*Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.,* 521 F.2d 392 (2d Cir. 1975) ......... 41

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................... 43

*Bey v. City of New York*, 999 F.3d 157 (2d Cir. 2021) ............................................... 16

*Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995) .............................................................. 29

*Block v. North Dakota ex rel. Bd. Of University and School Lands*, 461 U.S.
273 (1983) ........................................................................................... 13, 28, 43, 45

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265
(1986) ......................................................................................................................... 18

*Certain Underwriters at Lloyd's v. St. Joe Minerals Corp.,* 90 F.3d 671 (2d Cir.
1996). ......................................................................................................................... 42

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th
748 (2d Cir. 2023) ..................................................................................................... 16

*Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) ........................................ 29

*Fausett v. Guisewhite*, 225 N.Y.S.2d 616 (N.Y. App. Div. 1962) ........................ 32, 36

*Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144 (2d
Cir. 1999) ................................................................................................................... 46

*Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) .............................. 47

*Gorton v. Wager*, 149 N.Y.S.2d 887 (N.Y. Sup. Ct. 1956) ........................................ 36

*Jackson v. Fed. Express*, 766 F.3d 189 (2d Cir. 2014) ............................................... 17

*Kane Cty. v. United States*, 772 F.3d 1205 (10th Cir. 2014) .................... 19, 20, 26, 43

*Maryland Cas Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941) ........................... 42

*Michel v. United States*, 65 F.3d 130 (9th Cir. 1995) ............................................. 20, 26

*Narramore v. U.S.*, 852 F.2d 485 (9th Cir. 1988) .................................................... 22, 24

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002) ........................................................................................................................ 30

*NE 32nd Street, LLC v. United States*, 896 F.3d 1240 (11th Cir. 2018) .............. 20, 24

*New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286 (2d. Cir. 2012) ......................................................................................................... 46

*NJCB Spec-1, LLC v. Budnik*, 161 A.D.3d 885, 77 N.Y.S.3d 92 (2018) ............. 32, 34

*Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2012) ..................................................... 46

*Owners Corp. v. 330 W. 86 Oaks Corp.*, 865 N.E.2d 1228 (N.Y. 2007) ................... 32

*Paul Smith's College of Arts and Sciences v. Roman Catholic Diocese of Ogdensburg*, 130 N.Y.S.3d 547 (N.Y. App. Div. 2020) .............................................. 36

*Powell v. Nat'l Bd. Of Med. Examiners*, 364 F.3d 79 (2d Cir. 2004) ................... 17, 18

*Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130 (2d Cir. 2018) ....................... 17

*San Juan County, Utah v. U.S.*, 754 F.3d 787 (10th Cir. 2014) ................................. 26

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................... 17

*Shultz v. Department of Army*, 886 F.2d 1157 (9th Cir. 1989) ................................... 26

*United States v. Mottaz*, 476 U.S. 834 (1986) ........................................................... 45

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189 (2d Cir. 2013) ........................................................... 16

*Werner v. United States*, 9 F.3d 1514 (11th Cir. 1993) ......................................... 20, 21

*Wilkins v. United States*, 598 U.S. 152, 143 S. Ct. 870 (2023) ....................... 19, 20, 43

STATUTES:

5 U.S.C. §§ 701-706 ......................................................................................................3

16 U.S.C. § 459e .............................................................................................................5

28 U.S.C. § 1291 ...............................................................................3

28 U.S.C. § 1331 ...............................................................................3

28 U.S.C. § 1346 ...............................................................................3

28 U.S.C § 2201 ................................................................................3

28 U.S.C. § 2202 ...............................................................................3

28 U.S.C. § 2409 ...............................................................................3

28 U.S.C. § 2409a ............................................................................43

28 U.S.C. § 2409a(a) ........................................................................19

28 U.S.C. § 2409a(b) ........................................................................45

28 U.S.C. § 2409a(g) ........................................................................19

28 U.S.C. § 2410 ................................................................................3

42 U.S.C. § 4321 ................................................................................9

N.Y. Envtl. Conserv. Law § 11-0103 (10) ......................................38

N.Y. Envtl. Conserv. Law § 11-0103 (11) ......................................39

## I.   PRELIMINARY STATEMENT

For 50 years, from 1966 to 2016, the National Park Service ("**NPS**") honored the deed restrictions two non-profit organizations, Plaintiff-Appellant Wildlife Preserves Inc. ("**Plaintiff**") and non-party Sunken Forest Preserve Inc. ("**SFPI**"), insisted on before donating valuable land that became part of the Sunken Forest Preserve on Fire Island National Seashore ("**FINS**"). Plaintiff's mission since its founding in 1951 has been dedicated to the preservation of natural areas, open space, wildlife, and wildlife habitats for conservation, education and research. As a result, when donating the land that became part of the Sunken Forest (the "**Tracts**"), Plaintiff included deed restrictions to require the Tracts donated to be "maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population." In the event this restriction was violated, the deed included a reverter.

NPS has always publicly acknowledged the deed restrictions exist and have previously changed course to comply when Plaintiff raised issues about NPS's actions or proposed actions that would violate the deed restrictions. For example, in 1988, NPS planned an experimental deer hunt in the Sunken Forest. Once Plaintiff learned about the deer hunt, Plaintiff objected reminding the NPS that it would

1

violate the deed restrictions. As a result, the NPS canceled the deer hunt on the Tracts.

In 2016, however, NPS adopted the White-Tailed Deer Management Plan for FINS (the "**Plan**"), which allowed sharpshooting or capture and euthanasia of deer in the Sunken Forest and the construction of a wildlife exclusion fence around 44 acres of the Sunken Forest, which would bisect the donated and deed-restricted Tracts. Although Plaintiff contacted NPS to object to the Plan and NPS acknowledged the deed restrictions, NPS refused to reverse course on the Plan claiming that the Plan complied with the deed restrictions. As a result, Plaintiff was forced to file this suit.

During the litigation, Defendants raised the first time that Plaintiff's claims were time barred because Defendants constructed a fence in the Sunken Forest in 1967, which violated the deed restrictions and triggered the statute of limitations. Although Plaintiff argued in the District Court that Plaintiff did not have notice of the fence until this suit, the District Court ruled that Plaintiff had notice in 1988 when dealing with the experimental deer hunt. In particular, the District Court determined that Plaintiff knew or should have known that the 1967 fence existed when in 1988, the NPS Superintendent made a passing reference to Plaintiff's attorney about a derelict fence. As detailed below, that reference did not trigger the statute of limitations and, in any event, does not preclude this suit.

2

Were the Court to accept the District Court's ruling, donations of property to the government would likely decrease because people or organizations like Plaintiff with land preserves may not donate land for fear their wishes in the deed restrictions would not be honored. Accordingly, the Court should reverse the District Court's decision in all respects.

## II.    JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1331; 5 U.S.C. §§ 701-706; 28 U.S.C § 2201; 28 U.S.C. § 2202; 28 U.S.C. §§ 2409-2410 *et seq*.; and 28 U.S.C. § 1346. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgment dismissing the action on February 26, 2024, and Plaintiff filed a timely notice of appeal on March 25, 2024.

## III.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in denying Plaintiff's Motion for Summary Judgment?

In addition, Plaintiff shall raise the following sub-issues:

a.    Did the District Court err in determining that Plaintiff's Quiet Title Act ("**QTA**") claim falls outside of the twelve-year statute of limitations because its claim to title in Sunken Forest accrued at the latest by 1988?

3

b.    Did the District Court err in determining that Plaintiff knew or should have known that Defendants constructed a fence in the Sunken Forest based on the December 19, 1988 hearing in *Allen* and that such fence conflicted with the deed restrictions?

c.    Did the District Court err in determining that Plaintiff is not permitted to bring another QTA claim arising from the 2016 ROD and Plan?

d.    Did the District Court err in determining that because the underlying QTA claim is untimely, Plaintiff may not be awarded declaratory or injunctive relief?

## IV.   <u>STATEMENT OF THE CASE</u>

On November 29, 2017, Plaintiff initiated this action with co-plaintiff Animal Welfare Institute ("**AWI**") to enforce the deed restrictions on the Tracts, among other things. On February 26, 2024, the District Court denied Plaintiff's motion for summary judgment and granted Defendants' motion for summary judgment dismissing Plaintiff's claims. (A.2248 – A.2271.) [1] On February 28, 2024, the District Court entered judgment for the Defendants. (A.2272.) Plaintiff timely appealed. (A.2273 – A.2288.)

---

[1] A. = Joint appendix

A.    **Factual Background**

NPS is responsible for managing FINS, located in Suffolk County, New York. (A.51; A.58; A.83 – A.88.) FINS was established in September 1964 "for the purpose of conserving and preserving for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features within Suffolk County, New York, which possess high values to the Nation as examples of unspoiled areas of great natural beauty in close proximity to large concentrations of urban population." 16 U.S.C. § 459e. FINS encompasses nearly 19,600 acres of land, including the Sunken Forest. (A.52; A.95 – 105.)

The United States acquired the majority of the land comprising the Sunken Forest from SFPI, a non-party company no longer in operation, via a Deed executed on May 9, 1966 ("**1966 Deed**"). (A.49; A.68 – A.82; A.58; A.51; A.91 – A.92.) SFPI acquired a majority of the property it conveyed to the United States from Plaintiff, via a Deed executed on June 29, 1955 ("**1955 Deed**"). (A.48; A.61 – A.67.) We previously defined Plaintiff's land conveyed to the United States pursuant to the 1955 and 1966 Deeds as the "**Tracts**." Both deeds contained restrictions on how the Tracts could be used. (A.49; A.61 – A.67; A.50; A.61 – A.67; A.68 – A.82.)

Plaintiff conveyed the Tracts to SFPI via the 1955 Deed on the condition that the lands "shall be maintained in their natural state and operated as a preserve for

5

the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population[.]" (A.49; A.61 – A.67.) The 1955 Deed contains a reverter clause, which requires, in the event of the above restrictions being violated, that "the title of the grantee shall cease and determine and shall revert to and vest in the grantor [i.e. Plaintiff-Appellant], the said reversion and vesting to be automatic and not requiring any re-entry." (A.49; A.61 – A.67.) Specifically, the deed states:

> **This conveyance is made subject to the express condition and limitation** that the premises herein conveyed shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population, and for scientific and educational purposes incidental to such maintenance and operation. **Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor, the said reversion and vesting to be automatic and not requiring any re-entry.**

(A.49; A.65) (emphasis added).

SFPI conveyed the Tracts and a separate parcel to the United States via the 1966 Deed on the condition that "[a]ll of the premises shall always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wild life and its natural habitat, undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the flora

or fauna of said premises[.]" (A.50; A.61 – A.67; A.68 – A.82.) The 1966 Deed also stated the United States' interest is "subject to . . . the condition, limitation and reverter as contained in Liber 3918, page 429." (A.50; A.81 – A.82.) This refers to the deed restrictions and reverter clause included in the 1955 Deed, articulated above. (A.50; A.61; A.65.) In 2016, NPS acknowledged that the Tracts are subject to the deed restrictions. (A.51; A.89 – A.90.) In 1967, the U.S. Attorney General also acknowledged that the Tracts are "subject to a possibility of reverter." (A.52; A.82; *see also* A.51; A.80; A.51; A.81; A.52; A.61.)

In or around 1988, three year-round residents of Fire Island and Plaintiff filed suit against Donald P. Hodel, acting Secretary of the Interior, the U.S. Department of the Interior and the NPS. The Complaint contained seven causes of action against the defendants and sought an injunction against proposed deer hunts on FINS, including on the Tracts. (A.2057 – A.2067.) NPS removed the Tracts from the deer hunt prior to its commencement as a result of this litigation. (A.2104 – A.2015).

In particular, on December 16, 1988, in testimony taken during a hearing on a temporary restraining order in *Allen*, then Superintendent of FINS, Noel J. Pachta, testified to the removal of the Tracts from the hunt:

> THE COURT: Sunken Forest area, which says the land reverts to private land if hunting is permitted.
>
> MR. PACHTA: Yes.

THE COURT: Which may create a problem of losing the land if hunting is permitted.

MR. PACHTA: Yes, I understand that.

THE COURT: Well, that puts another complexion on the case.

MR. PACHTA: Except that, on advise [sic] of my counsel today I removed that section from the hunt.

THE COURT: This section?

MR. PACHTA: Yes. There will be no hunting of animals in that Sunken Forest area.

THE COURT: This is the area that Robert L. Perkins, Junior, head of the Wildlife [sic] Preserves Inc. donated?

MR. PACHTA: Yes, sir.

THE COURT: And you have taken all of the Wildlife [sic] Preserves Inc. land out of the hunt?

MR. PACHTA: Yes.

(A.2032.)

During that testimony, the Superintendent further confirmed there was no hunting that was occurring on the Tracts. (A.2044) ("there is no hunting going on in the Sunken Forest"); (A.2045) ("we have removed the markings from . . . the Sunken Forest portion only. It's not being hunted.")

At the hearing, counsel for Plaintiff, engaged in the following line of questioning with the Superintendent:

8

> MR. HOCHMAN: Are you familiar with that particular parcel of land donated in the deed?
>
> MR. PACHTA: Yes.
>
> MR. HOCHMAN: Do you know its exact boundaries?
>
> Mr. PACHTA: Some of the original sporadic fencing has been removed. We, in fact, treat that, the whole area from the Sailor's Haven Visitors Center to the boundary of Oaklyville and Point of Woods, we treated that whole area as the Sunken Forest which includes, certainly, the are that was donated.

(A.2043.) This was the only reference to any fence during that hearing.

The Court in *Allen* issued an Order reflecting the removal of the Tracts from the 1988 deer hunt on FINS, stating: "[t]he Sunken Forest area, which involves a question of reverter to private ownership if hunting is permitted, is not involved in any way in the proposed hunts." (A.2032.)

The *Allen* Court issued no decision on the subject of the FEIS. *Allen v. Hodel*, 1989 WL 8143 (E.D.N.Y. 1998). The Amended Complaint in *Allen* did not challenge any fencing. (A.2057 – A.2067.)

In June 2011, NPS commenced an environmental review process pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., by publishing a notice in the Federal Register announcing its intent to prepare an Environmental Impact Statement for a "Deer and Vegetation Management Plan" for FINS. (A.52; A.91 – A.92.) In August 2014, NPS published a notice in the Federal Register announcing the availability of a Draft Environmental Impact Statement for the

White-tailed Deer Management Plan for FINS. (A.52; A.93 – A.94.) In December 2015, NPS published a notice in the Federal Register announcing the availability of the Final White-Tailed Deer Management Plan and Environmental Impact Statement for FINS. (A.53; A.106 – A.107.) On April 28, 2016, NPS issued a Record of Decision ("**ROD**") adopting the Plan for FINS. (A.53; A.108 – A.174.)

NPS stated the need for the Plan was to "address impacts associated with changes in white-tailed deer abundance, distribution, and behavior" across FINS, including within the Sunken Forest. (A.53; A.108; A.122.) The Plan approved reducing deer populations to a target density of zero in the Sunken Forest by sharpshooting or capture and euthanasia. (A.54; A.112; A.124; A.54; A.112; A.126.) Once Defendants killed the deer, the population would be kept at zero by ongoing sharpshooting, capture and euthanasia, or nonsurgical reproductive control. (A.54 – A.55; A.112; A.124.) The Plan further authorized construction of a wildlife exclusion fence around 44 acres of the Sunken Forest. (A.55; A.111; A.125.) The exclusion fence would bisect the Tracts. (A.55; A.59 – A.60.) The exclusion fence would be a minimum of 8-10 feet high, with a mesh construction that would only allow small mammals to pass through. (A.55; A.108 – A.174.) As part of the construction process, deer would be driven out of the fenced-in area, and any deer remaining within the fence would be killed. (A.55; A.112; A.126.) Construction of

10

the exclusion fence would require trimming and removal of approximately 1.31 acres of vegetation in the Sunken Forest. (A.55; A.170.)

## B. **Procedural History**

### 1. **Plaintiff's claims**

On November 29, 2017, Plaintiff and co-plaintiff AWI filed suit against Soller, in his official capacity as Superintendent of FINS and the NPS for: (1) Declaratory Judgment that the Plan violates the deed restrictions; (2) Ejectment based on the fact that the Tracts must revert to Plaintiff because of NPS's violation of the deed restrictions; (3) Permanent Injunction prohibiting NPS from executing the Plan on the Tracts; (4) Violation of the Administrative Procedure Act/National Environmental Policy Act because of NPS's failure to consider all reasonable alternatives; and (5) Violation of NPS Organic Act, implementing regulations and policies.

On April 16, 2018, Plaintiffs filed an Amended Complaint with the same causes of action but updated certain allegations.

On August 3, 2020, the District Court granted defendants' motion to dismiss to the extent that Plaintiffs' claims arising under the QTA were dismissed for failure to name the United States as a party. The District Court granted Plaintiffs leave to file a second amended complaint.

11

On September 22, 2021, Plaintiffs filed a Second Amended Complaint against Defendants, which included: (1) Declaratory Judgment that the Plan violates the deed restrictions; (2) a claim under the QTA requesting that the court quiet title in the Tracts in favor of Plaintiffs; (3) Ejectment requesting that the Court either eject the United States from the Tracts or require the United States to pay just compensation to Plaintiffs; and (4) Permanent Injunction prohibiting NPS from executing the Plan on the Tracts.

## 2. The District Court's dismissal of the action

The District Court dismissed Plaintiff's claims, holding that the 1967 fence triggered Plaintiff's reversionary interest because, by erecting the fence, the government took actions that were adverse to Plaintiff's interest.

The District Court also held that Plaintiff knew or should have known of the 1967 fence in 1988 in the *Allen v. Hodel* matter. The District Court concluded that the NPS's Superintendent's testimony during *Allen* that "some of the original sporadic fencing" was removed in the Sunken Forest put Plaintiff's counsel on notice that Defendants may have violated and may still be violating the deed restrictions.

The District Court further held that Plaintiff is not permitted to bring another QTA claim relating to the 2016 ROD and Plan because Plaintiff violated the statute of limitations regarding the 1967 fence. Although Defendants did not cite any authority in support of their argument in the motion for summary judgment on this

12

issue, the District Court cited *Block v. N. Dakota ex rel. Bd. Of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983), which is not on point. As far as we are aware the District Court is the first court in the country to decide this issue.

The District Court also held that Plaintiffs are not entitled to Declaratory and Injunctive Relief because their underlying substantive claims were dismissed.

## V.   SUMMARY OF THE ARGUMENT

The Court should reverse the District Court's ruling for three reasons.

*First*, the District Court committed reversible error when it determined Plaintiff's QTA claim falls outside of the 12-year statute of limitations for at least four reasons. First, Plaintiff's claims are timely because the 12-year statute of limitations began running in 2016. The District Court's ruling that Plaintiff knew or should have known of the 1967 fence in 1988 during the *Allen v. Hodel* action after the NPS Superintendent made a passing reference in his testimony to "sporadic fencing having been removed" in the Sunken Forest is contrary to the law and facts. Circuit Courts hold that statutes of limitation run when the government changes its position to negatively affect the plaintiff regarding the property or property right. Here, Defendants acknowledged and complied with the deed restrictions until 2016 when they enacted the Plan. Thus, it was not until 2016 when Defendants changed their position by not complying with the deed restrictions by permitting

13

sharpshooting, capture and euthanasia of deer and the erection of a fence that the statute of limitations began to run.

Second, Plaintiff did not have a reasonable awareness in 1988 that the 1967 fence was adverse to its interest. The NPS Superintendent did not sufficiently elaborate on the 1967 fence during the *Allen* hearing to indicate that it was adverse to Plaintiff's deed restrictions. In addition, in 1988, NPS did not believe the 1967 fence violated the deed restrictions. It does not follow that Plaintiff should have nevertheless declared Defendants did violate the deed restrictions by constructing the 1967 fence.

Third, Defendants abandoned the claim that the Superintendent's reference to the 1967 fence during *Allen* triggered the statute of limitations. Not only did NPS acknowledge under oath during *Allen* that the deed restrictions existed and were valid, but NPS reversed course and canceled the deer hunt on the Sunken Forest. Defendants did not assert the 1967 fence as a reason why they should not be allowed to conduct a deer hunt on the Sunken Forest until this litigation.

Finally, even if Plaintiff violated the statute of limitations relating to the 1967 fence, Plaintiff is nevertheless entitled to bring another QTA claim against Defendants relating to the 2016 Plan because it is a different violation that occurred over 49 years later. As a result, in this issue of first impression for the Circuit Courts, the Court should adopt a "separate accrual" rule for the QTA, like this Court adopted

14

for RICO violations and the Supreme Court adopted for employment discrimination actions, under which a new claim accrues, triggering the 12-year statute of limitations, each time a plaintiff discovers, or should have discovered, a new violation.

*Second*, the Court should reverse the District Court because Defendants violated the deed restrictions when NPS issued the ROD triggering Plaintiff's reversionary interest in the Tracts. Plaintiff has a possibility of reverter on the Tracts and the U.S. has a "fee on limitation." The Plan violated the deed restrictions because it authorizes NPS to kill deer through sharpshooting, capture and euthanasia and to build a wildlife exclusion fence on the Tracts. The deed restrictions, however, require the government to maintain the land in its "natural state", "undisturbed" and as a "sanctuary and preserve for the maintenance of wild life."

*Third*, the Court should reverse the District Court because Plaintiff was entitled to summary judgment on its four claims. There is no genuine dispute of material fact on Plaintiff's Declaratory Judgment claim because a substantial controversy exists as Defendants violated the deed restrictions by approving the Plan, the parties have adverse legal interests in the Tracts and sufficient immediacy and reality exists because Defendants enacted the Plan, which constitutes final agency action. There is also no genuine dispute of material fact on Plaintiff's QTA claim because Plaintiff established that it retained a possibility of reverter in the

15

Tracts, that Defendants violated the deed restrictions, triggering Plaintiff's possibility of reverter in the Tracts and that Plaintiff's claims are timely. Finally, there is no genuine dispute of material fact on Plaintiff's Permanent Injunction claim because the removal and death of an entire species (deer) from the Tracts and the construction of a wildlife exclusion fence that will prevent the free movement of wildlife across the Tracts constitutes irreparable harm in Plaintiff's interest in preserving the Tracts in their natural state, undisturbed and as a wildlife sanctuary and preserve.

## VI.   <u>STANDARD OF REVIEW</u>

Courts of Appeals review a district court's decision to grant summary judgment, de novo, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor. *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023), quoting *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). "Summary judgment is required if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 192 (2d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). Likewise, an Appellate Court reviews de novo the district court's interpretation and

application of state law. *Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130, 134 (2d Cir. 2018) (citation and alteration omitted).

"A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Powell v. Nat'l Bd. Of Med. Examiners*, 364 F.3d 79, 84 (2d Cir. 2004); *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). Rule 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The materials presented by the parties to support or dispute facts must be capable of being presented at trial in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2); *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the

material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell*, 364 F.3d at 84 (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment must be entered against a party where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, no genuine issue concerning any material fact exists because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S. Ct. 2548. The summary judgment standard is interpreted in a way to support its primary goal of "dispos[ing] of factually unsupported claims or defenses." *Id.* at 323–24, 106 S. Ct. 2548.

## VII.    LEGAL ARGUMENT IN SUPPORT OF APPELLANT'S APPEAL

### A.    The District Court Committed Reversible Error When It Determined Plaintiff's QTA Claim Falls Outside Of The 12-Year Statute Of Limitations.

#### 1.    Plaintiff's claims are timely because the 12-year statute of limitations began running in 2016.

The District Court erred when holding that Plaintiff's claims are not timely because the 12-year statute of limitations began running in 1988. In particular, the District Court held Plaintiff knew or should have known of the 1967 fence in 1988

because the NPS Superintendent made a passing reference in a hearing during the *Allen v. Hodel* action that "sporadic fencing ha[d] been removed" in the Sunken Forest. The Court should reverse this ruling because it is adverse to the law and the facts. In actuality, Plaintiff's claims are timely because the 12-year statute of limitations began running in 2016 when Defendants issued the ROD.

The QTA permits the United States to "be named as a party defendant in a civil action . . . to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). The QTA states:

> Any civil action under this section . . . shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."

28 U.S.C. § 2409a(g).

The twelve-year statute of limitations is a "nonjurisdictional claim-processing rule." *Wilkins v. United States*, 598 U.S. 152, 165, 143 S. Ct. 870, 881 (2023). The "should have known" prong of this standard is governed by a test of reasonableness: when would a reasonable person have known that the United States claimed an adverse interest in the property. *Kane Cty. v. United States*, 772 F.3d 1205, 1215 (10th Cir. 2014) (abrogated on other grounds by *Wilkins*, 143 S. Ct. at 881). In interpreting the meaning of "claim of the United States," courts have held that for the statute of limitations to begin running, it "is not enough that the government

asserts 'some interest—any interest—in the property.'" *NE 32nd Street, LLC v. United States*, 896 F.3d 1240, 1243 (11th Cir. 2018) (quoting *Werner v. United States*, 9 F.3d 1514, 1519 (11th Cir. 1993)). Rather, the United States must assert an interest that is "'adverse[ ]' to the interest asserted by the plaintiff." *Id.* (quoting *Werner*, 9 F.3d at 1519) (citing *Kane Cty.*, 772 F.3d at 1216) (abrogated on other grounds by *Wilkins*, 143 S. Ct. at 881) (the statute of limitations begins to run when there "is a reasonable awareness that the Government claims some interest adverse to the plaintiff's . . . . As a public right-of-way can generally peaceably coexist with an underlying ownership interest, the United States must provide a county or state with sufficient notice of the United States' claim of a right to exclude the public."); *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995) (plaintiffs' "claim of access to roads and trails across [government property] did not accrue until [they] knew or should have known the government claimed the exclusive right to deny their historic access"). "[I]f the interests asserted by the parties are capable of peaceful coexistence . . . then the clock will not run. In contrast, adversity arises if the government asserts a *new* interest that is fundamentally incompatible with the interest asserted by the plaintiff or seeks to expand [a preexisting] claim."); *NE 32nd Street*, 896 F.3d at 1243 (emphasis in original).

Circuit Courts hold that statutes of limitation begin when the government *changes its position* to negatively affect the plaintiff regarding the property or

property right. For example, in *Werner v. U.S.*, the Eleventh Circuit reversed the District Court's ruling on a motion for summary judgment relating to an easement. *Werner*, 9 F.3d at 1514. In that case, the U.S. built an electrically operated gate in 1980 where the access road reached plaintiffs' property. *Id.* at 1516. For a time, the government provided plaintiffs with cards that unlocked the gate. *Id.* Later, the government only allowed plaintiffs access to the gate from 7am to 10pm. *Id.* The U.S. contended, and the District Court accepted, that the statute of limitations began when the U.S. claimed an ownership interest in the property, which was more than 12 years after the plaintiffs filed suit. *Id.* The Eleventh Circuit, however, reversed holding that the U.S. and the District Court misperceived the issue because the plaintiff did not dispute the government's ownership of the land. *Id.* Rather, the plaintiffs "look to the nature or extent of the government's interest" and describe it as limited or qualified by permissive use of the roadway by others. *Id.* Thus, the Eleventh Circuit ruled that the statute of limitations began when plaintiffs "knew or should have known that the government *changed its position* regarding the easement and, adversely to the interests of plaintiffs, denied or limited the use of the roadway for access to plaintiffs' property." *Id.* (emphasis added). When measured this way, the plaintiffs filed suit within the 12-year statute of limitations and the Eleventh Circuit reversed the District Court's ruling on the motion for summary judgment. *Id.* at 1519.

21

Similarly, in *Narramore v. U.S.*, the Ninth Circuit reversed the District Court's grant of summary judgment on a statute of limitations issue. *Narramore v. U.S.*, 852 F.2d 485 (9th Cir. 1988). In that case, Congress authorized construction of a dam and reservoir, which included a schedule for the release of flood waters from the reservoir known as "Plan A." *Id*. The Corps of Engineers, however, never followed Plan A, although their public position until 1977 was that Plan A was still in effect. *Id*. The Ninth Circuit determined that the plaintiffs showed rights or benefits until 1978 when the government asserted for the first time that it could remove or limit such rights. *Id*. Thus, the Ninth Circuit ruled that the date triggering the 12-year statute of limitations was the date the plaintiffs learned the government *changed their position* and sought to impose limitations on the Plan A benefits that the plaintiffs previously enjoyed. *Id*.

Here, NPS acknowledged and complied with the deed restrictions until 2016 when they enacted the Plan. In 1988, although NPS originally planned to conduct an experimental hunt of deer in the Sunken Forest, the FINS Superintendent testified during a hearing in the *Allen v. Hodel* matter that he was excluding the Sunken Forest from the hunt because of the deed restrictions. (A.2016; A.2031 – A.2032.) ("THE COURT: Sunken Forest area, which says the land reverts to private land if hunting is permitted. MR. PACHTA: Yes. THE COURT: Which may create a problem of losing the land if hunting is permitted. MR. PACHTA: Yes, I understand that. THE

COURT: Well, that puts another complexion on the case. MR. PACHTA: Except that, on advise [sic] of my counsel today I removed that section from the hunt. THE COURT: This section? MR. PACHTA: Yes. There will be no hunting of animals in that Sunken Forest area. THE COURT: This is the area that Robert L. Perkins, Junior, head of the Wild Life [sic] Preserves Inc. donated? MR. PACHTA: Yes, sir. THE COURT: And you have taken all of the Wild Life [sic] Preserves Inc. land out of the hunt? MR. PACHTA: Yes.); (A.2032) ("[t]he Sunken Forest area, which involves a question of reverter to private ownership if hunting is permitted, is not involved in any way in the proposed hunts"). Thus, in 1988, NPS's actions in canceling the deer hunt in the Sunken Forest matched their public position that the deed restrictions were valid.

In 2016, the Superintendent again acknowledged the deed restrictions were valid and in effect. Specifically, in 2016, Plaintiff wrote to the Superintendent conveying Plaintiff's concerns that the 2016 Plan violate the deed restrictions. (A.89 – A.90.) In 2016, the Superintendent responded to Plaintiff stating that NPS acknowledged the deed restrictions and believed the Plan complies with them. (A.51; A.89 – A.90.) Thus, NPS's public position has always been that the deed restrictions are valid, that NPS would comply with them and have complied with them. Plaintiff filed suit in 2017, however, because, unlike in 1988, NPS's actions in continuing with the Plan did not match NPS's public position that it was

23

complying with the deed restrictions. Therefore, similar to *Werner* and *Narramore*, the District Court should have ruled that the statute of limitations was triggered when NPS <u>changed its position</u> in 2016 when NPS issued the ROD and Plan permitting hunting, sharpshooting, capture and euthanasia of deer and erection of a fence on the Tracts in violation of the deed restrictions and refused to retract the Plan after Plaintiff raised the issue.

**2.** **Plaintiff did not have a reasonable awareness in 1988 that the 1967 fence was adverse to its interest.**

Contrary to the District Court's decision, Plaintiff did not have a reasonable awareness in 1988 that the 1967 fence was adverse to Plaintiff's interest for at least three reasons. *First*, the Superintendent did not sufficiently elaborate on the fence during the *Allen v. Hodel* hearing to indicate an expansion of the United States' claim in the Sunken Forest in a manner "that [was] fundamentally incompatible with the interest asserted by the plaintiff." *NE 32nd Street*, 896 F.3d at 1243. In response to a question about the boundaries of the particular parcel of land donated in the deed, the Superintendent stated "some of the original sporadic fencing ha[ving] been removed….we treated that whole area as the Sunken Forest which includes, certainly, the area that was donated" (A.2205; A.2043.) That was all that was said about the fence at that hearing. The Superintendent never elaborated on what fencing he was referring to, when it was built, why it was built, or whether it was completed. The Superintendent also did not mention where the sporadic fencing was located.

This is important because the Sunken Forest comprises more land than the Tracts. (A.52; A.98 – A.103.) In addition, the Superintendent never indicated that Defendants' claim was not capable of peaceful coexistence with Plaintiff's interest, as there was no suggestion that the sporadic fencing had adverse impacts on the flora or fauna of the Tracts or prohibited the Tracts from being used as a preserve and sanctuary for wildlife. Even if the 1967 fence had adverse impacts, the Superintendent stated that the fence "has been removed." (A.2205; A.2043.) Therefore, any legal action Plaintiff could have brought in 1988 would have been moot.

*Second*, Plaintiff did not have a reasonable awareness in 1988 that the 1967 fence was adverse to Plaintiff's interest because, in 1988, NPS did not believe the 1967 fence violated the deed restrictions. It does not follow that Plaintiff should have nevertheless declared Defendants *did* violate the deed restriction by constructing the 1967 fence. Although "[k]knowledge of the claim's full contours is unnecessary, the plaintiff must be on notice of an *adverse* interest asserted by the government." *Kane County Utah*, 772 F.3d at 1215.

Here, in 1988, NPS acknowledged under oath that the deed restrictions existed and that they would comply with them. NPS's actions comported with their public statements because NPS terminated the deer hunt in the Sunken Forest. In *Allen*, the Superintendent did not raise the 1967 fence as an issue adverse to Plaintiff or

25

mention that Defendants violated the deed restrictions by constructing the fence. Thus, in 1988, Plaintiff did not have a reasonable awareness that the 1967 fence was adverse to Plaintiff's interest. *Kane County Utah*, 772 F.3d at 1218 (holding that the statute of limitations did not begin to run in 1980 stating "[i]f the BLM did not believe wilderness designations conflicted with rights-of-way within the land, it would be strange indeed to declare that Kane County or Utah should have."); *San Juan County, Utah v. U.S.*, 754 F.3d 787, 794 (10th Cir. 2014) ("Because the public continued to have access to Salt Creek Road consistent with the claimed right-of-way, neither of the United States' road closures provided the county with sufficient notice of the United States' claim of a right to exclude the public, as would be necessary to assert a claim of exclusive ownership to Salt Creek Road").

### 3. Defendants abandoned the claim that the Superintendent's reference to the 1967 fence during *Allen v. Hodel* triggered the statute of limitations.

"If the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted." *Shultz v. Department of Army*, 886 F.2d 1157, 1161 (9th Cir. 1989).

For example, in *Michel v. U.S.*, 65 F.3d 130, 133 (9th Cir. 1995), landowners filed an action under the QTA seeking to quiet title to access routes to their land across a national wildlife refuge. *Id.* at 131. The District Court granted the

government's motion to dismiss on the basis that the plaintiffs violated the statute of limitations because the plaintiffs knew since 1960 when the dispute between the parties began, which was more than 12 years before the plaintiff filed suit, that the government claimed an exclusive right to access. *Id.* The Ninth Circuit, however, reversed because it determined that the government abandoned its claim of exclusive control. *Id.* at 133. Although the parties' dispute began in 1960, the government acknowledged in writing in 1970 that the plaintiffs had a right of access across the refuge. *Id.* As a result, the Ninth Circuit ruled that, in 1970, the government abandoned any argument that the plaintiffs did not have such right. *Id.*

Similarly, here, in 1988, Defendants abandoned their claim that the Superintendent's reference in *Allen v. Hodel* to the 1967 fence triggered the statute of limitations. This is because not only did NPS acknowledge under oath during *Allen* that the deed restrictions existed and were valid, but NPS reversed course and canceled the deer hunt on the Sunken Forest. Indeed, in 1988, Defendants never asserted the 1967 fence was a reason why Defendants should be allowed to conduct the experimental deer hunt in the Sunken Forest. It was not until this suit that Defendants asserted *for the first time* that the 1967 fence triggered the deed restrictions. As a result, the District Court erred when determining that the statute of limitations on the 1967 fence began in 1988.

**4.** **Even if Plaintiff violated the statute of limitations relating to the 1967 fence, Plaintiff is nevertheless entitled to bring another QTA claim against Defendants relating to the 2016 Plan because it is a separate issue.**

The District Court erred when it ruled that Plaintiff is not permitted to bring another QTA claim arising from the 2016 Plan if the statute of limitations applies to the 1967 fence. This is an issue of first impression for a Circuit Court because we are not aware of any other court ruling on this issue, other than the District Court in this case.

Although Defendants included no authority in their motion for summary judgment briefing in support of their argument on this issue, the District Court relied on *Block v. North Dakota ex rel. Bd. Of University and School Lands*, 461 U.S. 273 (1983) when agreeing with Defendants' argument. *Block*, however, is inapposite because it does not discuss whether a party can assert a different claim under the QTA if it is time barred from asserting another separate claim.

In *Block*, the State of North Dakota filed suit under the QTA against several federal officials to resolve an ownership dispute regarding riverbeds in the State. The District Court ruled that the QTA's 12-year statute of limitations does not apply if a State is the plaintiff. After the federal government appealed on that issue, North Dakota also argued in the appeal that, even if it is time-barred under the QTA, it is entitled to bring an "officer's suit" against federal officers and circumvent the QTA. The Supreme Court ruled that the States are bound by the 12-year statute of

28

limitations in the QTA and are not permitted to circumvent the QTA by filing an "officer's suit". Nowhere in *Block* does the Court discuss whether a party can bring a second separate QTA suit against the government if time barred from bringing another QTA suit.

Here, Plaintiff is not challenging the 1967 fence. Rather, Plaintiff is challenging the 2016 Plan—a totally different violation. As a result, the Court should adopt a "separate accrual" rule for the QTA, like this Court adopted for RICO violations and the Supreme Court adopted for employment discrimination actions, under which a new claim accrues, triggering the 12-year statute of limitations, each time a plaintiff discovers, or should have discovered, a new violation.

Specifically, in RICO actions, this Circuit recognizes a "'separate accrual'" rule under which a new claim accrues, triggering a four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995) (citing *Cruden v. Bank of New York*, 957 F.2d 961, 977 (2d Cir. 1992)).

For example, in *Bankers Trust v. Rhoades*, 859 F.2d 1096, 1098 (2d Cir. 1988), defendants, officers of a bankrupt corporation, fraudulently concealed assets of the bankruptcy estate through a complicated series of transactions and instituted frivolous lawsuits against the plaintiffs to prevent them from recovering a legitimate debt. *Id*. at 1098-99. The plaintiffs incurred various legal fees and expenses over

time, besides the loss of the debt itself. *Id*. at 1105-06. This Court ruled that, because multiple and independent injuries occurred over a broad span of time, a rule permitting a new cause of action to accrue with each independent injury was the "logical end result." *Id*. at 1103.

Similarly, the Supreme Court ruled in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002) that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id*. at 115. In that case, an African American former employee brought action against the employer railroad for racial discrimination and retaliation under Title VII. *Id*. at 104. The Court ruled that "[e]ach discrete discriminatory act starts a new clock for filing [discrimination] charges". *Id*. at 113.

Here, Defendants' violations of the QTA occurred over a broad span of time and involve two distinct incidents. The District Court ruled Defendants violated the deed restrictions in 1967 with the construction of a chain-link six-foot fence on portions of the Sunken Forest pursuant to the terms of an agreement. Defendants violated the deed restrictions again in 2016—49 years later—when enacting the Plan, authorizing sharpshooting, capture and euthanasia of deer in the Sunken Forest and the erection of a mesh wildlife exclusion fence, which would bisect the Tracts, built to protect plants in the Sunken Forest from deer browsing. Defendants' actions

are completely independent from one another and, like RICO and employment discrimination, should be considered separate injuries that accrue separately for purposes of the statute of limitations. Thus, the Court should rule that, even if Plaintiff violated the statute of limitations relating to the 1967 fence, Plaintiff is nevertheless entitled to bring another QTA claim against Defendants relating to the 2016 Plan because it is a separate and distinct issue.

5.    **The Court should reverse because the District Court's ruling would have a chilling effect on land donations to the NPS.**

The Court should also reverse because the ruling of the District Court would have a chilling effect on land donations to the NPS and government throughout the country. Practically speaking, the ruling of the District Court would make individuals or organizations like Plaintiff less likely to donate land to the NPS or government if they knew that, should the NPS or government violate any deed restrictions included in the grant, there would be such tough hurdles to overcome, like those imposed by the District Court relating to the statute of limitations, and the courts would likely not uphold the deed restrictions.

Here, NPS accepted the Tracts knowing that the deed included the deed restrictions. If the NPS's actions are upheld and the District Court's ruling is affirmed, individuals and organizations like Plaintiff will think twice before donating land to NPS or the government for fear their wishes will not be followed. Accordingly, the Court should reverse the District Court's decision.

**B.    Defendants Violated The Deed Restrictions When NPS Issued The ROD, Triggering Plaintiff's Reversionary Interest In The Tracts.**

### 1.    Plaintiff has a possibility of reverter on the Tracts.

The language of the 1955 and 1966 Deeds created a reversionary interest in the grantors. Specifically, the reversionary interest created in Plaintiff and SFPI, respectively, was a possibility of reverter. "The distinguishing element of a possibility of reverter is that the grantor retains a right to regain the fee upon the happening of an event; he regains it automatically; and … the grantor's interest in the possibility of reverter is alienable[.]" *Fausett v. Guisewhite*, 225 N.Y.S.2d 616, 619 (N.Y. App. Div. 1962). If the grantor has a possibility of reverter, re-entry is not required to regain the fee. *Id.* at 620.

"No precise language is necessary to create a possibility of reverter, but '[a] characteristic of the type of expression which works automatic expiration of the grantee's fee seems to be one in which time is an important factor,' such as use of the words 'until,' 'so long as,' or 'during[.]'" *NJCB Spec-1, LLC v. Budnik*, 161 A.D.3d 885, 77 N.Y.S.3d 92, 94 (2018) (quoting *Fausett*, 225 N.Y.S.2d at 616). "'[E]very instrument creating [or] transferring . . . an estate or interest in real property must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law.'" *NJCB Spec-1, LLC*, 77 N.Y.S.3d at 94 (quoting *328 Owners Corp. v. 330 W. 86 Oaks Corp.*, 865 N.E.2d 1228 (N.Y. 2007)).

The language of the 1955 Deed makes clear that the parties intended to create a possibility of reverter, to be held by Plaintiff. The 1955 Deed states:

> **This conveyance is made subject to the express condition and limitation** that the premises herein conveyed shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population, and for scientific and educational purposes incidental to such maintenance and operation. **Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor, the said reversion and vesting to be automatic and not requiring any re-entry.**

(A.49; A.65) (emphasis added).

The Deed's use of the words "reversion and vesting to be automatic and not requiring any re-entry" upon the cessation of the land's use for the intended purposes unequivocally demonstrates the parties' intent to create a possibility of reverter, because the defining characteristic of a possibility of a reverter is that the "grantor retains a right to regain the fee upon the happening of an event[, and] he regains it automatically." *Fausett*, 225 N.Y.S.2d at 619. The parties' explicit use of the word "automatic" also demonstrates intent to create a possibility of reverter. Furthermore, when the interest retained by the grantor is a possibility of reverter, no re-entry is required, and as such, the parties' explicit statement that re-entry is not required demonstrates intent to create a possibility of reverter. While the 1955 Deed does not

33

use the words "'until,' 'so long as,' or 'during,'" the use of such words is not required, as "no precise language is necessary to create a possibility of reverter" under New York law. *NJCB Spec-1, LLC*, 77 N.Y.S.3d at 94. The 1955 Deed therefore created a possibility of reverter held by Plaintiff.

The language of the 1966 Deed makes clear that the parties intended to create a possibility of reverter held by SFPI. The 1966 Deed states that the conveyance is subject to "[t]he condition, limitation, and reverter as contained in Liber 3918, page 429." (A.50; A.81 – A.82.) This refers to the 1955 Deed, which states on page 429 that the conveyance is "<u>subject to the express condition and limitation hereinafter set forth</u>." (A.50; A.61) (emphasis in original). The "express condition and limitation hereinafter set forth" refers to the paragraph on page 5 of the 1955 Deed (Liber 3918, page 433), which states, as articulated above:

> **This conveyance is made subject to the express condition and limitation** that the premises herein conveyed shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population, and for scientific and educational purposes incidental to such maintenance and operation. **Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor, the said reversion and vesting to be automatic and not requiring any re-entry.**

(A.49; A.65; A.50, A.65) (emphasis added).

34

The 1966 Deed thus incorporates by reference of the possibility of reverter in the 1955 Deed. This incorporation demonstrates the parties' intent that the same reversionary interest in the 1955 Deed be applicable to the conveyance to the United States. There is no indication that SFPI intended to convey the Tracts *without* the reversionary interest in the 1955 Deed. If the parties intended that SFPI not retain a reversionary interest or had intended to create another interest that was different from the possibility of reverter in the 1955 Deed, the parties would not have specifically stated that the 1966 Deed was "subject to the . . . reverter" in the 1955 Deed.

Notably, as SFPI was a party to both the 1955 and 1966 Deeds, the 1966 Deed's use of the word "reverter" sheds light on the intent of the parties to the 1955 Deed. "Reverter" refers to the legal term of art "possibility of reverter", as distinguishable from right of reentry. This provides further support for a finding that the reversionary interest created in the 1955 Deed, and incorporated into the 1966 Deed, was a possibility of reverter. Moreover, as a further demonstration of the parties' intent, and of the United States' legal interpretation of the right retained by the grantor, the U.S. Attorney General sent a letter to Stewart Udall, then Secretary of the Interior, on March 15, 1967, stating that the United States' title to the Tracts was subject to "the condition, limitation and reverter" discussed above, and that the

land is "subject to a possibility of reverter." (A.52; A.82; *see also* A.51; A.80; A.51; A.81; A.52; A.61.)

**2.      The United States holds a "fee on limitation" in the Tracts.**

When a grantor retains a possibility of reverter, the property interest that is conveyed to a grantee is known by a variety of terms, including fee on limitation, fee on special limitation, fee simple determinable, determinable fee, in fee simple conditional, or in determinable fee simple conditional. *Fausett*, 225 N.Y.S.2d at 619. Courts issuing more recent decisions have adopted the term fee on limitation, *see, e.g.*, *Paul Smith's College of Arts and Sciences v. Roman Catholic Diocese of Ogdensburg*, 130 N.Y.S.3d 547, 549 (N.Y. App. Div. 2020), and this is the term Plaintiff uses herein. As Plaintiff and SFPI each retained a possibility of reverter in the 1955 and 1966 Deeds, respectively, the interest that the United States acquired in the 1966 Deed was a fee on limitation in the Tracts.

Under New York law, a grantee's fee on limitation terminates automatically, and the grantee's property interest automatically reverts and vests in the grantor as a fee simple interest, upon breach of the restriction in the deed. *Fausett*, 225 N.Y.S.2d at 619-620. When a possibility of reverter is established, "the estate reverts at once upon the occurrence of the event by which it is limited[.]" *Gorton v. Wager*, 149 N.Y.S.2d 887, 891 (N.Y. Sup. Ct. 1956) (internal quotations omitted). "The estate is to continue only until the happening of the contingent event which limits it;

36

it then comes to an end of itself because by the express terms of the provision creating the estate it is to continue only up to that time." *Id.* at 892 (internal citations omitted). The grantee's estate "ends on the happening of the limitation because its natural end, provided for in its creation has been reached." *Id.*

### 3. The 2016 ROD and Plan violated the deed restrictions.

Defendants violated the restrictions in both the 1955 and 1966 Deeds by issuing the ROD and Plan, which authorizes NPS to kill deer through sharpshooting and capture and euthanasia, as well as to construct a wildlife exclusion fence, which would bisect the Tracts. (A.54; A.112; A.124; A.54; A.112; A.126; A.54; A.128 – A.129; A.55; A.111; A.125.) This violation triggered Plaintiff's reversionary interest in the Tracts.

Conducting lethal deer management on the Tracts undermines the intent of the grantors and the purpose of the restrictions. Killing deer violates the deed restrictions because such actions would "adversely affect the . . . fauna" that live on the Tracts. Furthermore, killing all the deer on the Tracts, thereby eliminating an entire species from those lands, directly violates Defendants' obligation to maintain[]" the land in its "natural state." The destruction of the deer population is also incompatible with the operation of the Tracts as a "sanctuary and preserve for the maintenance of wild life." Additionally, killing deer directly contradicts the language in the Deeds that requires the wildlife to remain "undisturbed." Therefore,

the actions approved in the ROD are manifestly inconsistent with the intent of the grantors.

Moreover, both lethal methods NPS approved for killing deer—sharpshooting and capture and euthanasia—are expressly forbidden by the deed restrictions, which prohibit "hunting" and "trapping" of wildlife. New York law broadly defines "hunting" as:

> [P]ursuing, shooting, killing or capturing (other than trapping as defined in subdivision 11) wildlife, except wildlife which has been lawfully trapped or otherwise reduced to possession, and includes all lesser acts such as disturbing, harrying or worrying, whether they result in taking or not, and every attempt to take and every act of assistance to any other person in taking or attempting to take wildlife.

N.Y. Envtl. Conserv. Law § 11-0103 (10).

The methods Defendants approved in the Plan to kill deer on the Tracts meet the definition of "hunting" under New York law. Specifically, sharpshooting involves the "shooting" and "killing" of wildlife, and capture and euthanasia involves the "capturing" and "killing" of wildlife. *See* N.Y. Envtl. Conserv. Law § 11-0103 (10).

Additionally, capture and euthanasia meets the definition of "trapping" under New York law. New York law defines "trapping" as:

> [T]aking,[2] killing and capturing wildlife with traps, deadfalls and other devices commonly used to take wildlife, and the shooting or killing of

---

[2] New York State law defines "taking" to include: "pursuing, shooting, hunting, killing, capturing, trapping, snaring and netting fish, wildlife, game, shellfish, crustacea and protected insects, and all lesser acts such as disturbing, harrying or worrying, or placing, setting, drawing or using any net or other device commonly

wildlife lawfully trapped, and includes all lesser acts such as placing, setting or staking such traps, deadfalls and other devices whether they result in taking or not, and every attempt to take and every act of assistance to any other person in taking or attempting to take wildlife with traps, deadfalls or other devices.

N.Y. Envtl. Conserv. Law § 11-0103 (11).

The Plan states that NPS would capture deer "using select trapping methods." (A.54; A.128 – A.129.) This indicates that deer would be "capture[d] … with traps … and other devices commonly used to take wildlife." N.Y. Envtl. Conserv. Law § 11-0103 (11). NPS would then euthanize trapped deer, (A.54; A.128 – A.129), which constitutes the killing of trapped wildlife. N.Y. Envtl. Conserv. Law § 11-0103 (11). Thus, there is no doubt that the lethal management methods NPS will engage in constitute "hunting" and "trapping," which directly violates the express terms of the 1955 and 1966 Deeds and the intent of the grantors.

Defendants also violated the deed restrictions by authorizing construction of an exclusion fence on the Tracts, requiring that deer be driven out of the fenced-in area, and mandating that any deer subsequently found in the fenced-in area be killed via sharpshooting or capture and euthanasia, (A.55; A.111; A.125; A.55; A.112; A.126), which undermines the intent of the grantors and the purpose of the restrictions. The Plan requires NPS to install exclusion fencing around approximately 44 acres of the Sunken Forest, including the Tracts. (A.55; A.111,

used to take any such animal." N.Y. Envtl. Conserv. Law § 11-0103(13).

A.125.) The fence will bisect and enclose the majority of the Tracts. (A.55; A.111, A.125; A.55; A.59 – A.60.) The fence will be a minimum of 8-10 feet high and the only wildlife that will be able to move freely through the fence will be "most small animals." (A.55; A.114; A.125.) In addition, construction of the fence will require removal of approximately 1.31 acres of vegetation in the Sunken Forest. (A.55; A.170.)

Building an exclusion fence directly violates the deed restrictions because it will "adversely affect the … fauna" by barring deer and larger species of wildlife from accessing the Tracts. This obliterates the use of the Tracts as habitat for deer and larger species of wildlife, which undermines Defendants' obligation to operate the land as a "sanctuary and preserve for the maintenance of wild life[.]" It also raises the risk for birds and other animals to become entangled in or injured through collision with the fence, which violates the deed restrictions. In addition, construction of the exclusion fence violates the deed restrictions because it will "adversely affect … the flora." Destruction of 1.31 acres of vegetation in the Sunken Forest reduces the quality of the habitat on the Tracts and disrupts the "natural state" of the Tracts, which directly violates the deed restrictions. This will likely remain a permanent disturbance as vegetation will need to be managed to maintain access to the fence for maintenance and repairs. Construction of a wildlife exclusion fence

therefore clearly contradicts the intent of the grantors that the land exist undisturbed in its natural state to serve as a sanctuary and preserve for wildlife.

Furthermore, driving deer from the Tracts as part of the fence construction process, and killing any deer subsequently found within the fence after it is completed, violates the deed restrictions. NPS's goal of eliminating an entire species from the Tracts undermines Defendants' obligation to maintain the land in its "natural state" and to operate it "solely as a sanctuary and preserve for the maintenance of wild life," in addition to "adversely affect[ing] the … fauna" on the Tracts, for the reasons discussed above. Additionally, the lethal methods that NPS will use to kill deer remaining within the fence constitute "hunting" and "trapping" for the reasons discussed above, and thereby violate the deed restrictions.

## C. Plaintiff Was Entitled To Summary Judgment On Its Claims.

### 1. There is no genuine dispute of material fact on Plaintiff's Declaratory Judgment claim.

Plaintiff was entitled to summary judgment on its declaratory judgment claim. "[T]he purpose of declaratory relief is to . . . settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975). Declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages. *In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d Cir. 1998).

Declaratory judgment is appropriate if the "facts alleged, under all the circumstances," demonstrate: (1) a substantial controversy; (2) between parties having adverse legal interests; (3) of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *In re Prudential Lines Inc*., 158 F.3d 65, 70 (2d Cir. 1998) (*quoting Maryland Cas Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Where the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks "sufficient immediacy and reality" to warrant declaratory relief. *In re Prudential Lines Inc*., 158 F.3d 65, 70 (2d Cir. 1998) (citing *Certain Underwriters at Lloyd's v. St. Joe Minerals Corp*., 90 F.3d 671, 675 (2d Cir. 1996). One factor courts consider in determining whether declaratory judgment is appropriate is "whether the agency action is 'final.'" *In re Combustion Equipment Associates, Inc*., 838 F.2d at 37-38.

Plaintiff meets these three elements. *First*, a substantial controversy exists as to whether Defendants violated the deed restrictions by approving lethal deer management and construction of a wildlife exclusion fence on the Tracts, and if Defendants did violate the restrictions, what the legal implications are for Plaintiff's and the United States' property interests in the Tracts. *Second*, the Parties have adverse legal interests in the Tracts, with Plaintiff claiming the ROD and Plan violated the deed restrictions and triggered Plaintiff's reversionary interest, and Defendants asserting that the United States' interest in the Tracts is unaffected by

the ROD and Plan. *Lastly*, sufficient immediacy and reality exists in this case because Defendants have issued a ROD and the Plan, (A.52; A.61), which constitutes final agency action. *Bennett v. Spear*, 520 U.S. 154 (1997). The Plan's authorization of lethal deer management and construction of wildlife exclusion fencing on the Tracts violates the deed restrictions for the reasons argued above. Thus, the District Court should have ruled that Plaintiff was entitled to a declaratory judgment that the ROD and Plan violate the deed restrictions and a declaratory judgment as to the impact the violation has on title to the Tracts.

> ### 2.      There is no genuine dispute of material fact on Plaintiff's QTA claim.

Plaintiff was entitled to summary judgment on its QTA claim. Under the QTA, the United States has waived its sovereign immunity and permitted plaintiffs to name it as a defendant in any action to "adjudicate a disputed title to real property in which the United States claims an interest[.]" 28 U.S.C. § 2409a; *Block*, 461 U.S. at 275, 280. For a court to have jurisdiction under this statute, a plaintiff must establish: "(1) the United States "claims an interest in the property at issue; and (2) title to the property is disputed." *Kane County, Utah*, 772 F.3d at 1210-11 (abrogated on other grounds by *Wilkins*, 598 U.S. at 152). "To satisfy the 'disputed title' element of the QTA, a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it." *Kane County*, 772 F.3d at 1212.

Here, the Court has jurisdiction because Plaintiff can establish both elements of its QTA claim. *First*, it is undisputed that the United States claims an interest in the Tracts because the 1966 Deed conveyed title to the United States, (A.49; A.68 – A.82), in the form of a fee on limitation. *Second*, title to the Tracts is disputed because the United States, through NPS, has taken action that implicitly disputes the title by issuing a ROD and Plan that require management activities that violate the deed restrictions. NPS has asserted that it did not violate the deed restrictions, (A.51; A.89 – A.90), such that the United States' title to the Tracts remains undisturbed. Plaintiffs contend the opposite: that Defendants violated the deed restrictions through enactment of the ROD and Plan, which triggered Plaintiff's reversionary interest. This gives rise to disputed title, which satisfies the second element of the inquiry.

The District Court should have ruled that Plaintiff was entitled to summary judgment on its QTA claim because Plaintiff clearly established that Plaintiff retained a possibility of reverter in the Tracts, that Defendants violated the deed restrictions, thus triggering Plaintiff's possibility of reverter in the Tracts, and that Plaintiff's claims are timely. Under New York law, upon violation of the restrictions, the United States' interest in the Tracts would automatically terminate, and a fee simple interest would automatically vest in Plaintiff. However, here, because the

grantee is the United States, and its property interests are governed by the QTA, the analysis is more complex.

Courts have interpreted the QTA to preclude an automatic reversion of interest, *see, e.g.*, *United States v. Mottaz*, 476 U.S. 834 (1986), which would be available under New York law. Instead, the QTA provides that, if a final determination is adverse to the United States, "the United States nevertheless may retain possession or control of the real property or any part thereof as it may elect, upon payment . . . of an amount . . . which the district court . . . shall determine to be just compensation." 28 U.S.C. § 2409a(b); *Block*, 461 U.S. at 283 ("the QTA allows the United States the option of paying money damages instead of surrendering the property if it lost a case on the merits"). Therefore, ownership of the Tracts may revert to Plaintiff, but only if the United States so chooses.

As such, if Defendants lose this case on the merits, they have three options to redress the harm to Plaintiff: (1) the United States relinquishes title to the Tracts, and a fee simple interest vests in Plaintiff; (2) the United States elects to retain title to the Tracts, pay Plaintiff just compensation for its interest in the Tracts; or (3) the United States elects to rescind, via a formal rulemaking process, the action that violated the deed restrictions, thereby restoring both parties to the legal position they were in prior to April 2016. In that instance, the United States would retain a fee on limitation in the Tracts, and Plaintiff would retain a possibility of reverter in the

45

Tracts. Defendants have not advised Plaintiffs as to which option they would select if Defendants lose this case on the merits.

**3.    There is no genuine dispute of material fact on Plaintiff's Permanent Injunction claim.**

The District Court should have ruled that Plaintiff is entitled to summary judgment on its permanent injunction claim upon the occurrence of certain conditions. "The requirements for a permanent injunction are 'essentially the same' as for a preliminary injunction, except that the moving party must demonstrate 'actual success' on the merits." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d. Cir. 2012). The party requesting permanent injunctive relief must demonstrate: (1) that he will be irreparably harmed in the absence of an injunction; and (2) actual success on the merits. *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012) (citation omitted). To demonstrate irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (quotations omitted). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). The removal and death of wild animals has been

found to constitute irreparable harm. *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993).

The irreparable injury element is satisfied here because the removal and death of an entire species from the Tracts, and the construction of a wildlife exclusion fence that will prevent the free movement of wildlife across the Tracts, will irreparably harm Plaintiff's interest in preserving the Tracts in their natural state to be used as a wildlife sanctuary and preserve. (A.2018). These actions will also irreparably harm Plaintiff's interest in protecting the animals on the Tracts from hunting, trapping, and other adverse effects. (A.2018). Moreover, violation of the deed restrictions has caused Plaintiff irreparable injury because it has had a chilling effect on the future donation of land by Plaintiff. (A.2019). These injuries are neither remote nor speculative, but actual and imminent, because the ROD constitutes final agency action and NPS is required to implement the ROD and Plan. Accordingly, a permanent injunction is warranted.

In this case, if the United States relinquishes title to the Tracts, then a permanent injunction should issue barring Defendants from implementing the Plan on the Tracts during the time it takes for the United States to transfer a fee simple interest to Plaintiff. If the United States elects to retain title to the Tracts and pay Plaintiff just compensation, then a permanent injunction should issue barring Defendants from implementing the Plan on the Tracts until briefing on just

compensation is concluded, the court issues a ruling, and Plaintiff receives payment in full. If the United States elects to rescind, via a formal rulemaking process, the action that violated the deed restrictions, a permanent injunction should issue barring Defendants from implementing the Plan during the time that it takes NPS to undergo a new environmental review process pursuant to NEPA, and to issue a new ROD and Plan that excludes the Tracts from lethal deer management actions and rescinds the decision to build a wildlife exclusion fence on the Tracts. The permanent injunction in this instance should also bar NPS from adopting a ROD and Plan that is the same or substantially similar to the current ROD and Plan. Specifically, the permanent injunction should prevent NPS from using lethal methods to manage deer on the Tracts, including by placing bait outside the perimeters of the Tracts in an effort to lure deer from the lands to be killed, and from constructing a wildlife exclusion fence on the Tracts. Regardless of which option the United States chooses, a permanent injunction should issue barring implementation of the Plan on the Tracts during the period of time that it takes the United States to reach a determination on which option it will pursue in the event Defendants lose this case on the merits.

## IV.   <u>CONCLUSION</u>

Accordingly, for all of the above reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Appeal.

Dated: June 28, 2024                **MEYNER AND LANDIS LLP**

<u>/s/ Catherine Pastrikos Kelly</u>
By:   Catherine Pastrikos Kelly, Esq.
      (CP3300)
      100 Park Avenue, 16th Floor
      New York, New York 10016
      973-602-3423 (t)
      973-624-0356 (f)
      ckelly@meyner.com
      *Attorneys for Plaintiff-Appellant*
      *Wildlife Preserves, Inc.*

49

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B).  As measured by Microsoft Word 2013, the word-processing system used to prepare it, this brief contains 11,864 words.

Dated:  June 28, 2024

/ s / Catherine Pastrikos Kelly
_____
Catherine Pastrikos Kelly
*Attorney for Appellant*

# SPECIAL APPENDIX

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 17-CV-06952 (RER) (ARL)

---

ANIMAL WELFARE INSTITUTE, ET AL.

VERSUS

ROMERO, ET AL.

---

**MEMORANDUM & ORDER**

February 26, 2024

---

**RAMÓN E. REYES, JR., U.S.D.J.:**

Plaintiffs Animal Welfare Institute ("AWI") and Wildlife Preserves, Inc. ("WPI") (together, "Plaintiffs") brought this action against the Superintendent of Fire Island National Seashore ("FINS"), and the United States National Park Service, an agency of the U.S. Department of the Interior ("NPS"), raising various claims, including under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, concerning the Record of Decision ("ROD") finalizing the FINS White-Tailed Deer Management Plan and Final Environmental Impact Statement ("Plan") adopted by NPS. (ECF No. 1 ("Compl.")). Plaintiff AWI is a non-profit animal advocacy organization. (ECF No. 59 ("SAC") ¶ 1). Plaintiff WPI is a non-profit land conservation corporation. (*Id.* ¶ 2).

On August 3, 2020, District Judge Sandra J. Feuerstein granted in part a motion to dismiss Plaintiff's Amended Complaint, but with leave to file a second amended complaint joining as defendant the United States of America ("United States," and together with FINS and NPS, "Defendants"). (ECF No. 49 ("Mem. & Order"); *see generally*

SA.1

SAC). Plaintiffs filed the Second Amended Complaint on September 22, 2021. (SAC). Now before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 90 ("Pls Mot.")) and Defendants' Cross-Motion for Summary Judgment (ECF No. 94 ("Defs Cross-Mot.")). After carefully reviewing the record, and for the reasons set forth herein, Plaintiffs' Motion for Summary Judgment is denied, Defendants' Cross-Motion for Summary Judgment is granted, and the case is dismissed.

## **FACTUAL BACKGROUND**[1]

### A. Conveyance of Property

This case concerns restrictions on property that were originally created on June 29, 1955, when WPI conveyed via deed four tracts of property ("WP Tracts") to non-party Sunken Forest Preserve, Inc. ("SFPI"). (ECF No. 91 ("Shotwell Decl."), Ex. 1 ("1955 Deed"); ECF No. 90-2 ("Pls 56.1") ¶ 1; ECF No. 109 ("Defs 56.1 Resp.") ¶ 1). The WP Tracts are located in the Sunken Forest Preserve ("Sunken Forest"), a 44-acre piece of land on the FINS. (ECF No. 75-1 ("Defs 56.1") ¶ 9; ECF No. 101-1 ("Pls 56.1 Resp.") ¶ 9). The Sunken Forest is a globally rare habitat of national significance in the Northeastern United States. (Defs 56.1 ¶ 10; Pls 56.1 Resp. ¶ 10). Per Congressional directive,[2] NPS

---

[1] The Court assumes as true, for the purposes of the summary judgment motions, facts taken from the parties' respective Rule 56.1 statements of undisputed facts, declarations, and exhibits. *See Fierro v. Galluci*, No. 06-CV-5189 (JFB) (WDW), 2010 WL 1223122, at *1 (E.D.N.Y. Mar. 24, 2010). In addition, the Court recognizes the filings in prior litigation, described in further detail throughout. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–75 (2d Cir. 1991) (holding that the Court may consider matters of which judicial notice may be taken under Federal Rule of Evidence 201).

[2] On September 11, 1964, Congress enacted 16 U.S.C. § 459e ("FINS enabling legislation"), which mandates that "[t]he Secretary [of the Interior] shall administer and protect the Fire Island National Seashore with the primary aim of conserving the natural resources located there." 16 U.S.C. § 459e-6(a). It further states that "the Sunken Forest Preserve shall be preserved from bay to ocean in as nearly its present state as possible[.]" *Id.* The enabling legislation also states that the Secretary "shall permit hunting, fishing, and shellfishing on lands and waters under his administrative jurisdiction within the Fire Island National Seashore in accordance with the laws of New York and the United States of America, except that the

SA.2

is responsible for managing FINS and the wildlife thereon, including the Sunken Forest. (Pls 56.1 ¶ 16; Defs 56.1 Resp. ¶ 16).

> The 1955 Deed states that the conveyance of the WP Tracts to SFPI is:
>
>> subject to the express condition and limitation that the premises herein conveyed *shall be maintained in their natural state and operated as a preserve for the maintenance of wildlife and its natural habitat undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the animal population*, and for scientific and educational purposes incidental to such maintenance and operation. *Should the premises cease to be used solely for the above purposes, or should any activities be engaged thereon that would adversely affect either the flora or the fauna, then the title of the grantee shall cease and determine and shall revert to and vest in the grantor*, the said reversion and vesting to be automatic and not requiring any re-entry.

(1955 Deed at 5[3] (emphasis added); Pls 56.1 ¶ 2; Defs 56.1 Resp. ¶ 2). This provision created WPI's reversionary interest in the WP Tracts. The 1955 Deed further transfers the property to SFPI, "TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its successors and assigns forever, <u>subject to the express condition and limitation hereinabove set forth</u>." (*Id.* at 6) (emphasis in original).

> On May 9, 1966, SFPI conveyed the WP Tracts, plus an additional parcel of land, to the United States via a deed. (Shotwell Decl., Ex. 2 ("1966 Deed"); Pls 56.1 ¶ 6; Defs 56.1 Resp. ¶ 6). The 1966 Deed states, in relevant part,
>
>> [A]ll of the premises hereby conveyed shall always be maintained in their natural state and operated solely as a sanctuary and preserve for the maintenance of wild life and its natural habitat, undisturbed by hunting, trapping, fishing or any other activities that might adversely affect the environment or the flora or fauna of said premises; and for scientific and educational purposes incidental to such maintenance and operation.

---

Secretary may designate zones where, and establish periods when, no hunting shall be permitted for reasons of public safety, administration, or public use and enjoyment." *Id.* § 459e-4.

[3] All page numbers cited refer to the document's ECF-stamped page number, or, where applicable, the PDF page number.



(1966 Deed at 10). In addition, the 1966 Deed states that the conveyance is subject to "[t]he condition, limitation, and *reverter* as contained in [the 1955 Deed]." (*Id.* at 14 (emphasis added)).

As part of the second conveyance, on February 24, 1966, SFPI and NPS entered into a Cooperative Agreement, which was not recorded and was not referenced within the 1966 Deed. (ECF No. 96 ("Knapp Decl."), Ex. G ("Cooperative Agreement"); Pls 56.1 Resp. ¶¶ M, O; ECF No. 102 ("Defs 56.1 Reply") ¶¶ M, O). The Cooperative Agreement provides that,

> to assist the [NPS] in maintaining the property to be conveyed to it under [the Cooperative] Agreement as a sanctuary, the primeval portion of the Sunken Forest and certain additional parts of the Preserve adjacent thereto and in the vicinity thereof shall be fenced as soon as possible with a chain link fence 6 feet high . . . with 3 stands of barbed wire above the same with gates to accommodate pedestrians[.]

(Cooperative Agreement at 4; Defs 56.1 ¶ 15; Pls 56.1 Resp. ¶ 15). WPI contends, and Defendants dispute, that it did not have knowledge of the Cooperative Agreement or the fence constructed pursuant to the Cooperative Agreement until the initiation of this lawsuit. (Pls 56.1 Resp. ¶ L; Defs 56.1 Reply ¶ L).

B. Fencing of the Sunken Forest

The purpose of the fence agreed to in the Cooperative Agreement was to protect the WP Tracts and other deeded lands as a sanctuary to benefit wildlife and protect the ecosystem by restricting visitor access to the lands. (Pls 56.1 Resp. ¶ Q; Defs 56.1 Reply ¶ Q). In late-1966 and early-1967, NPS corresponded with FINS officials and SFPI regarding the fence's construction. (Pls 56.1 Resp. ¶ P; Defs 56.1 Reply ¶ P). WPI was not privy to the correspondence. (*Id.*). On December 1, 1966, FINS Acting Superintendent Robert Branges ("Branges") sent a memorandum to the NPS Regional Director,

4

Northeast Region, regarding fencing in the Sunken Forest. (ECF No. 101-2 ("Supp. Shotwell Decl."), Ex. 7). The letter states, in part,

> we advocate that there not be a complete enclosure; rather the open end would be near Sailors Haven where protection by personnel is available. This also permits freer access by deer and fox who would otherwise be impounded or excluded with possible detrimental results. The five foot fence, even with barbed wire strands on top, is not a guaranteed deterrent to humans which argues further for a lesser stand on complete encirclement of whatever we plan to enclose.

(*Id.* at 64).

The NPS Regional Director conveyed a similar position to James Dunlop ("Dunlop"), President of SFPI, in a letter dated December 6, 1966. (Supp. Shotwell Decl., Ex. 8). The letter states, in part,

> we advocate that there not be a complete enclosure. Rather, the open end would be near Sailors Haven where protection by National Park Service personnel is available. This also permits freer access by deer and fox who would otherwise be impounded or excluded from the area with possible detrimental results . . . [I] ask that you and members of the Sunken Forest Preserve, Inc. Board of Directors seriously consider completing the fence in the manner suggested above.

(*Id.* at 67).

On April 27, 1967, FINS Superintendent Henry Schmidt ("Schmidt"), stated in a letter to Dunlop,

> we have continued the fence eastward from the west line of the Sunken Forest, and are enclosing the larger areas . . . . The decision to do this is two fold. First, in order to enclose the area with a fence on the west boundary of the Sunken Forest Preserve Property, it would have been necessary to cut and clear an eight foot swatch through some very fine trees and natural cover. We did not want to do this, and I am sure that you and your people would not have wanted the trees cut. Second, by enclosing the larger area we included additional fine natural environment which can be better protected by the fence . . . . We are all well aware that the Sunken Forest is to remain as a natural sanctuary and because of this, we must provide the best protection possible.

SA.5

(Supp. Shotwell Decl., Ex. 9). Schmidt noted that the project was nearing completion. (*Id.* at 69).

NPS completed the remainder of the construction of the fence in 1967, and sections of it remained in The Sunken Forest into the late 1980s. (Defs 56.1 ¶ 16; Pls 56.1 Resp. ¶ 16; Knapp Decl., Ex. E at 12:8–19).

C. Prior Litigation

In 1988, various parties, including WPI, brought suit against NPS and others seeking, in part, to enjoin a proposed experimental research hunt on FINS in December 1988 and January 1989. *Allen v. Hodel*, No. 88-CV-3901 (TPC) (ASC), 1989 WL 8143, at *1 (E.D.N.Y. Jan. 11, 1989). The plaintiffs' causes of action included the failure to comply with preliminary rulemaking procedures, failure to take measures to adequately protect the public, negligently planning the proposed hunt, and others. *Id.*[4] Although the Sunken Forest was initially among the areas of FINS on which the experimental hunt was to be conducted, it was excluded from the hunt during the pendency of the *Allen* litigation. *Allen*, 1989 WL 8143, at *7 ("[t]he Sunken Forest area, which involves a question of reverter to private ownership if hunting is permitted, is not involved in any way in the proposed hunts"). FINS Superintendent Noel J. Pachta ("Pachta") confirmed as much in testimony taken during a hearing in *Allen* on December 16, 1988, the day before the hunt began:

> THE COURT: Sunken Forest area, which says the land reverts to private land if hunting is permitted.
> MR. PACHTA: Yes.
> THE COURT: Which may create a problem of losing the land if hunting is permitted.
> MR. PACHTA: Yes, I understand that.

---

[4] The *Allen* plaintiffs, including WPI, did not allege a cause of action under the Quiet Title Act, 28 U.S.C. § 2409a. *See Allen*, 1989 WL 8143, at *1; (*see also* Defs 56.1 ¶ 33; Pls 56.1 Resp. ¶ 33).

> THE COURT: Well, that puts another complexion on the case.
> MR. PACHTA: Except that, on advise [sic] of my counsel today I removed that section from the hunt.
> THE COURT: This section?
> MR. PACHTA: Yes. There will be no hunting of animals in that Sunken Forest area.
> THE COURT: This is the area that Robert L. Perkins, Junior, head of the Wild Life [sic] Preserves Inc. donated?
> MR. PACHTA: Yes, sir.
> THE COURT: And you have taken all of the Wild Life [sic] Preserves Inc. land out of the hunt?
> MR. PACHTA: Yes.

(Supp. Shotwell Decl., Ex. 2 at 17:1–19). The WP Tracts were excluded from the hunt after WPI alerted FINS officials, several days before the hunt was set to begin, of WPI's automatic reverter if hunting were to occur on the WP Tracts. (*See* Supp. Shotwell Decl., Ex. 3 at 21:1–9). During another hearing in *Allen*, on December 19, 1988, Pachta testified: "That's why as I very often do when I get threatening letters from attorneys in making promises, that information is conveyed to my regional solicitor who at that point through discussion—then we made a decision to remove that portion of Sunken Forest for right now." (*Id.* at 21:22–22:7).

Fencing of the Sunken Forest was discussed during the same hearing. (*See id.* at 28:11–19). In particular, in response to a question posed by then-counsel for WPI, Edward Hochman ("Hochman"), as to "the exact boundaries" of the "particular parcel of [The Sunken Forest] land donated" by WPI, Pachta testified, "[s]ome of the original sporadic fencing has been removed. We, in fact, treat that, the whole area from the Sailor's Haven Visitors Center to the boundary of Oaklyville [sic] and Point of Woods, we treated that whole area as the Sunken Forest which includes, certainly, the area that was donated." (*Id.*). Following this testimony, Hochman presented Pachta with a copy of the

7

SA.7

1955 Deed's reversion provision, and then continued to question Pachta about the boundaries of the hunt. (*See id.* at 28:20–31:10).

Ultimately, in *Allen*, the court upheld NPS's authority to conduct the experimental research hunt on FINS, not including the Sunken Forest area. *See Allen*, 1989 WL 8143, at *10.

D.  The NPS Plan

In the mid-1980's, "researchers documented a significant decline in plant species and abundance of the Sunken Forest . . . ." (Shotwell Decl., Ex. 9 ("ROD and Plan") at 2). In recent years, scientists observed that many "[vegetation] species have dramatically declined in abundance or have been altogether extirpated from the area by deer browse[.]" (ECF No. 100-2 at 125). Then, on April 28, 2016, NPS issued a ROD finalizing the Plan,[5] the purpose of which is to promote the "protection, preservation, regeneration, and restoration of native vegetation and other natural and cultural resources at the Seashore; and minimize undesirable human-deer interactions while maintaining a viable population of white-tailed deer within the Seashore." (ROD and Plan at 1, 15; Pls 56.1 ¶ 27; Defs 56.1 Resp. ¶ 27). The Plan aims to "address impacts associated with changes in white-tailed deer abundance, distribution, and behavior." (*Id.* at 1, 15). To achieve this, the Plan sets forth management actions that will "utilize a combination of lethal and nonlethal actions to reduce and maintain deer density at a target level[.]" (*Id.* at 5, 17). For the Sunken Forest, the deer density target is set at zero. (*Id.*). Lethal actions to achieve the target density within the Sunken Forest consist of "sharpshooting or capture

---

[5] The Plan is an attachment to the ROD and contains "the complete description of the selected action[.]" (Shotwell Decl., Ex. 9 at 12–67).

and euthanasia." (*Id.* at 5, 19). Once the target deer density is attained via lethal actions it "will be maintained . . . by either direct reduction (sharpshooting, capture and euthanasia[)] . . . or by nonsurgical reproductive control when an acceptable agent becomes available." (*Id.* at 5, 17).[6]

In addition, the Plan includes the "use of exclusion fencing to protect the Sunken Forest maritime holly forest[.]" (*Id.* at 4, 18). The exclusion fence would be "installed around approximately 44 acres of the Sunken Forest to protect the majority of the rare maritime holly forest from deer browse[.]" (*Id.*). "Approximately 29 acres of exclusion fence will be within the Sunken Forest Preserve and approximately 15 acres will be outside the Preserve, extending to the east[.]" (*Id.*). The exclusion fence "will be a minimum of 8 [to] 10 feet high and mesh size will be sufficient to allow most small animals to move freely through the fence[.]" (*Id.* at 7, 18). Pursuant to the ROD and Plan, "[d]uring construction of the fence, deer will be removed from the fenced area by driving them out" and "[o]nce the fence is completed, any deer found inside the fence will be removed through direct reduction (sharpshooting or capture and euthanasia)." (*Id.* at 5, 19).

Installation of the exclusion fence "will result in some adverse impacts on vegetation in the Sunken Forest," given "trimming and removal of some vegetation." (*Id.* at 63). "The extent of linear vegetation removal needed for fence installation totals approximately 1.31 acres in the Sunken Forest[.]" (*Id.*). "To minimize impacts on surrounding vegetation, clearing will be accomplished by hand using hand tools.

---

[6] NPS first announced its intent to prepare an environmental impact statement for a "Deer and Vegetation Management Plan" for FINS on June 17, 2011, via publication of a notice in the Federal Register. (Pls 56.1 ¶ 22; Defs 56.1 Resp. ¶ 22; *see also* Shotwell Decl., Ex. 5). After a period of public comment, the final study was published on December 31, 2015. (Pls 56.1 ¶ 26; Defs 56.1 Resp. ¶ 26; *see also* Shotwell Decl., Ex. 8).

SA.9

Seashore staff will select alignments for the fence that will minimize removal of overstory trees in the Sunken Forest[.]" (*Id.*). "Vegetation will be allowed to recover along the edge of the fence where construction impacts occurred. Vegetative recovery is expected within one to two growing seasons after fence installation." (*Id.*).

## PROCEDURAL HISTORY

Plaintiff commenced this action on November 29, 2017, and filed an Amended Complaint on April 16, 2018. (*See* Compl.; ECF No. 17). On November 20, 2018, Defendants moved to dismiss several claims in the Amended Complaint, arguing that, inter alia, the Court lacked subject matter jurisdiction under the QTA, Plaintiffs failed to join the United States as a necessary party, the claims are time-barred or foreclosed by res judicata and collateral estoppel, and the Amended Complaint failed to state a claim. (*See generally* ECF No. 29). On August 3, 2020, District Judge Sandra J. Feuerstein granted in part Defendants motion to dismiss, holding that Plaintiffs failed to join the United States as a necessary party, but allowed Plaintiffs to file a second amended complaint. (Mem. & Order at 11–12). The Court further held that the question of whether the claims are time-barred could not be resolved on the motion to dismiss. (*Id.* at 17).

On September 22, 2021, Plaintiffs filed the Second Amended Complaint, requesting that the Court (1) issue a declaratory judgment that the Plan violates the deed restrictions and the WP Tracts immediately reverted to WPI as a result of the enactment of the Plan; (2) quiet title in the WP Tracts in favor of Plaintiffs; (3) either (i) eject the United States from the WP Tracts, allow Wildlife Preserves to recover possession of the WP Tracts, and order Defendants to execute a deed for the WP Tracts in favor of Wildlife Preserves, its successors and assigns; or (ii) require the United States to pay just

10

SA.10

compensation to Plaintiffs; and (4) rule that the Plan violates the deed restrictions on the WP Tracts and permanently enjoin NPS from executing the Plan on the WP Tracts. (SAC ¶¶ 50–77).

In December 2022 and January 2023, the parties requested a pre-motion conference on their anticipated motions for summary judgment. (*See* ECF Nos. 67, 75, 76, 79). District Judge Nina R. Morrison[7] denied the requests for a pre-motion conference and set a briefing schedule. (Order dated 4/13/2023). On August 31, 2023, the parties filed the fully briefed Motion and Cross-Motion. (*See* Pls Mot.; ECF Nos. 90-1 ("Pls Mem."), 110 ("Defs Opp."), 92 ("Pls Reply"); Defs Cross-Mot., ECF Nos. 95 ("Defs Mem."), 98 ("Pls Opp."), 103 ("Defs Reply")).

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011) (citing *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010)).

---

[7] After several reassignments, on October 26, 2022, District Judge Nina R. Morrison was assigned to the case. (Ordered dated 10/26/2022). On December 7, 2023, the case was reassigned to me for all further proceedings. (Order dated 12/7/2023).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial." *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *4 (E.D.N.Y. Apr. 2, 2020) (citing *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009)). To do so, the nonmoving party may not rely on "[a] mere 'scintilla of evidence'" but "'must come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (first quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003), then quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)); *see also Garcia v. Saigon Mkt. LLC*, No. 15 Civ. 9433 (VSB), 2019 WL 4640260, at *3 (S.D.N.Y. Sept. 24, 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) ("To defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'").

To satisfy their respective burdens, the parties may rely upon "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Where the non-movant will ultimately bear the burden of proof at trial, he must present evidence to support the essential elements of his claims." *Hristova v. 3321 Astoria Inc.*, No. 17-CV-1633 (RER), 2018 WL 4006880, at *3 (E.D.N.Y. June 27, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Absent evidence supporting the non-movant's claims, judgment should be entered for the moving party." *Id.* But "[i]f

the evidence is such that a 'jury could reasonably find for the nonmovant,' the motion must be denied." *Id.* (quoting *Anderson*, 477 U.S. at 252).

II.        The Quiet Title Act

"The QTA authorizes (and so waives the Government's sovereign immunity from) a particular type of action, known as a quiet title suit: a suit by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). In order for a court to exercise jurisdiction over an action under the QTA, "1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property between interests of the plaintiff and the United States." *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1023 (9th Cir. 2001). The Supreme Court has held that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983).

## DISCUSSION

Claims under the QTA must be brought within a twelve-year statute of limitations: "[a]ny civil action under this section . . . shall be barred unless it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g). As discussed in further detail herein, WPI's QTA claim falls outside of the twelve-year statute of limitations because its claim to title in the WP Tracts accrued at the latest by 1988. Further, WPI's time-barred QTA claim could not be resurrected by the 2016 ROD and Plan. Consequently, because the underlying QTA claim is untimely, Plaintiffs may not be

13

awarded declaratory or injunctive relief. Finally, Plaintiffs' claim for ejection is preempted by the QTA.

I.       WPI's QTA Claim is Time-Barred

Under the QTA, an "action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest *knew or should have known* of the claim of the United States." 28 U.S.C. § 2409a(g) (emphasis added); *see also United States v. Beggerly*, 524 U.S. 38, 39 (1998). In the context of WPI's claims,[8] the statute of limitations began to run on the date that WPI knew or should have known that a reversionary interest in the WP Tracts was triggered. The Court previously held that, "[g]iven the nature of the reversionary interest, the only rational interpretation of the QTA is that the conduct that triggers the reverter places the title in dispute and simultaneously commences the running of the statute of limitations." (Mem. & Order at 16). The Court further noted that "[w]hether [WPI's] reversionary interest was triggered . . . cannot be answered on the current record on Defendants' motion to dismiss." (*Id.* at 17). Now, on summary judgment, the Court is tasked with determining when, if ever, WPI's reversionary interest in the WP Tracts was triggered for QTA statute of limitations purposes.

WPI argues that its reversionary interest was triggered on April 28, 2016, when the ROD was issued. (Pls Mem. at 19–23). Specifically, WPI argues that "when NPS issued the ROD requiring enactment of a Plan that mandated lethal deer management and

---

[8] As an initial matter, AWI is not a proper party to the QTA claim. The Supreme Court has made clear that under the QTA, "adverse claimants" means "plaintiffs who themselves assert a claim to property antagonistic to the [f]ederal [g]overnment's." *Patchak*, 567 U.S. at 215 (holding that plaintiff's claim did not fall under the QTA because the plaintiff himself did not assert title to the disputed land); *see also Call-A-Head Corp. v. United States*, No. 21-CV-3234 (LDH) (VMS), 2022 WL 263164, at *2 (E.D.N.Y. Jan. 27, 2022) (same). AWI has not asserted a claim to title to the WP Tracts. Accordingly, the Court considers the QTA claim only with respect to WPI throughout the remainder of this memorandum.

construction of a wildlife exclusion fence on the WP Tracts, Defendants violated the deed restrictions." (*Id.* at 22). WPI therefore argues that because it brought suit less than two years later, on November 29, 2017, the QTA claim falls well within the twelve-year statute of limitations. (*Id.* at 19). Defendants, on the other hand, argue that WPI's reversionary interest was triggered in 1966 or 1967, when SFPI conveyed the Sunken Forest to the United States with the proviso that the Sunken Forest be enclosed with a chain-link and barbed wire fence, and when the fence was ultimately constructed, or alternatively in 1988 when WPI definitively gained notice thereof. (Defs Mem. at 19–22).[9]

A. The 1967 Fence Triggered WPI's Reversionary Interest

A threshold question in the Court's inquiry is whether the 1967 fence triggered WPI's reversionary interest for QTA statute of limitations purposes. The Supreme Court has held that "a condition to the waiver of sovereign immunity . . . must be strictly construed." *Wilkins v. United States*, 598 U.S. 152, 162 (2023); *see also Block*, 461 U.S. at 287. As such, "the trigger for starting that twelve-year clock running is an exceedingly light one." *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012). In the context of the QTA statute of limitations, the Court need not determine whether Defendants' conduct conclusively and unequivocally violated the deed restrictions. *See Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989). Rather, the relevant inquiry is whether the government took actions that were *adverse* to plaintiff's interest. *See id.*; *see also*

---

[9] Defendants alternatively argue that WPI's reversionary interest was triggered (1) in 1966, when the United States took title to the WP Tracts, because the 1964 FINS enabling act obligated NPS to allow hunting on the WP Tracts (Defs Mem. at 21); (2) in 1975, when NPS issued a final environmental impact statement that "gave notice that the NPS intended to permit deer hunting at FINS per its 'legislative mandate'" (*id.* at 21–22); or (3) in 1988, when NPS conducted a deer hunt within FINS, originally including the Sunken Forest (*id.* at 22). Because the Court finds that WPI's reversionary interest was triggered based on the 1967 fence, the Court does not consider these alternative arguments.

15

*Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("the [QTA] statute of limitations inquiry is whether the plaintiff had notice of the federal claim, *not whether the claim itself is valid*") (emphasis added). The government's conduct "merely must be substantial enough to create a cloud on title." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010). Further, even "invalid [ ] claims trigger the [QTA] limitations period . . . and the merits of the [ ] claim are not relevant to the limited inquiry[.]" *Graham v. United States*, No. 21-CV-03053 (NYW), 2022 WL 1288477, at *8 (D. Colo. Apr. 29, 2022) (quotation marks omitted).

Here, WPI maintains that the purpose of the 1967 fence was "fully consistent with and advance[d] the purposes of the deed restrictions." (Pls Opp. at 10). Specifically, WPI argues that, unlike the fence mandated by the 2016 ROD and Plan, "[t]here is no evidence that the purpose of the 1967 fence was to exclude wildlife." (*Id.* at 10–11). However, correspondence regarding the fence suggests that the fence did, in fact, exclude wildlife. For example, correspondence makes clear that the fence was ultimately enclosed on all sides, despite the letters advocating against full enclosure. (Supp. Shotwell Decl., Ex. 9 at 69 ("we have continued the fence eastward from the west line of the Sunken Forest, and are enclosing the larger areas")). The correspondence further states that full enclosure would "impound[] or exclude[] [deer and fox] from the area with possible detrimental results." (Supp. Shotwell Decl., Exs. 7 at 64, 8 at 67). WPI itself concedes, in briefing regarding the 2016 ROD and Plan, that "eliminating an entire species from the WP Tracts violates Defendants' obligation to maintain the land in its 'natural state' as a sanctuary and preserve for the maintenance of wildlife.'" (Pls Opp. at 28–29 (quoting 1955 Deed at 5)). WPI further admits that "barring deer and larger species of wildlife from

SA.16

accessing the WP Tracts" violates the deed restrictions by "adversely affect[ing] the . . . fauna." (Pls Opp. at 29 (quoting 1955 Deed at 5)). The Court is not aware of how, as a practical matter, a fully enclosed, five-foot high, chain-link and barbed-wire fence could have allowed for the free access of deer and larger species of wildlife.

In addition, WPI points to the correspondence regarding the fence to support the argument that the purpose of the 1967 fence was to "protect the WP Tracts as a sanctuary to benefit wildlife and protect the ecosystem by restricting visitors from disturbing the area." (Pls Opp. at 10). But, as WPI rightly points out in briefing regarding the 2016 ROD and Plan, "[Defendants' stated] purpose, need, and objectives do not grant [them] the authority to violate the deed restrictions." (Pls Opp. at 32). The Court finds that the fence did not, in fact, serve the purpose of "maintain[ing] [the WP Tracts] in their *natural* state," as required by the deed restrictions. (*See* 1955 Deed at 5 (emphasis added)).[10] Accordingly, the record makes clear that the 1966 proviso and construction of the 1967 fence are fundamentally at odds with the deed restrictions. The Court therefore finds that the government's conduct was sufficient to trigger WPI's revisionary interest for QTA statute of limitations purposes.[11]

---

[10] WPI further argues that the 1967 fence aligned with the intent of SFPI and the United States, "as neither party would have entered into a cooperative agreement that required a violation of the deed they had recently executed." (Pls Opp. at 11). Given that the 1967 fence did conflict with the deed restrictions, the parties' *intention* in creating the fence is irrelevant.

[11] Defendants alternatively argue that the deed restrictions should not be enforced because they are vague and ambiguous, and, if enforced, would produce unreasonable results. (*See* Defs Mem. at 26–34; Defs Opp. at 28–32). WPI maintains that the deed restrictions are not vague and ambiguous, and are enforceable. (*See* Pls Opp. at 24–28). Ultimately, the Court need not determine whether the deed restrictions are enforceable. Rather, the relevant inquiry for QTA statute of limitations purposes is whether Defendants' action would have reasonably alerted WPI that Defendants' acted adverse to the deed restrictions. *See Shultz*, 886 F.2d at 1160; *see also Kingman Reef Atoll Invs., L.L.C.*, 541 F.3d at 1197.

B. <u>WPI Knew or Should Have Known of the 1967 Fence</u>

Having determined that the 1967 fence triggered WPI's reversionary interest, the Court next considers whether WPI "knew or should have known" that a QTA claim accrued. *See* 28 U.S.C. § 2409a(g). All parties agree that the Cooperative Agreement referencing the fence was not recorded at any point. (Pls 56.1 Resp. ¶¶ M, O; Defs 56.1 Reply ¶¶ M, O). The parties dispute, however, whether WPI had knowledge of the Cooperative Agreement or the fence constructed in connection with the Cooperative Agreement until the initiation of this lawsuit. (Pls 56.1 Resp. ¶ L; Defs 56.1 Reply ¶ L). WPI asserts that it did not have notice of the fence until this litigation, and so the QTA claim did not accrue until the 2016 ROD and Plan. (Pls Opp. at 11). As described in further detail herein, the Court finds that this dispute of fact is not material, as WPI reasonably "should have known" about the fence based on the December 19, 1988 hearing in *Allen*.

Even standing alone, FINS Superintendent Pachta's 1988 testimony that "some" of the fencing around or within the Sunken Forest was removed should have raised WPI's suspicions that a fence had been constructed. (*See* Knapp Decl., Ex. E at 12:8–19; *id.*). The testimony suggests that not only was there a history of fencing around the Sunken Forest, but also that other fencing remained. In that moment, WPI, via its counsel, was put on notice that Defendants may have violated and may still be violating the deed restrictions. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (where knowledge acquired by counsel was imputed to plaintiff at the time that his counsel received said information). WPI argues that Pachta "never elaborated on what fencing he was referring to, when it was built, why it was built, or whether it was completed." (Pls Reply at 11). But WPI did not need to know "the claim's full contours" in order for the QTA statute of

18

SA.18

limitations to accrue. *See Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980). Nor did WPI need to know "the precise nature" of the government's conduct. *See Rio Grande Silvery Minnow*, 599 F.3d at 1176. Instead, WPI only needed to be "reasonabl[y] aware[]" of a claim to title. *Id.*

Furthermore, the Court cannot view this testimony in a vacuum and must look to the broader context of the litigation. In *Allen*, the Sunken Forest was initially among the areas of FINS on which the experimental hunt was to be conducted, but was excluded from the hunt. *Allen*, 1989 WL 8143, at *7. The exclusion was not a coincidence. Rather, NPS decided to exclude the WP Tracts from the hunt only after WPI informed NPS of the deed restrictions and the possibility of reverter. (*See* Supp. Shotwell Decl., Ex. 3 at 21:1–9, 21:22–22:7). Pachta testified to that affect during the December 19, 1988 hearing, shortly before he testified regarding the 1967 fence. (*Id.*). In addition, directly after Pachta testified regarding the 1967 fence, Hochman presented Pachta with the 1955 Deed's reverter provision and proceeded to ask Pachta questions regarding the hunt. (*Id.* at 28:20–29:16). This context makes clear that one of WPI's interests in the *Allen* litigation was in preventing the deed restrictions from being violated and ensuring that they were not. The deed restrictions were front of mind for WPI, and any potential violation thereof should have been recognized. The Court finds that WPI, as a reasonable party, should have known that a fence surrounding the donated land could conflict with the deed restrictions. Therefore, the QTA claim accrued by 1988, and WPI had, at the latest, until 2001 to bring a timely claim.[12]

---

[12] Defendants argue that WPI's reversionary interest was extinguished between 1993 and 1996, because WPI failed to file a "declaration of intention" to preserve the interest within 27 to 30 years of its creation, as required by New York Real Property Law Section 345 ("RPL 345"). (Defs Opp. at 27–28); *see* N.Y. Real

SA.19

C.  <u>WPI Cannot Resurrect a Time-Barred QTA Claim</u>

Finally with respect to the QTA, the Court must dispel WPI's notion that even if its QTA claim arising from the 1967 fence is time-barred, it is permitted to bring another QTA claim arising from the 2016 ROD and Plan. (Pls Opp. at 8–10). WPI's theory is as follows:

> [I]f the statute of limitations has run due to some previous activity, then that merely precludes a grantor from challenging a grantee's title due to that particular activity. It does not preclude a challenge of future, different activities that trigger a reversionary interest. Assuming, arguendo, that the four activities Defendants cite did indeed trigger WP's reversionary interest, such that the QTA's statute of limitations began to run, then WP simply would be barred from bringing an action alleging that title to the WP Tracts was in dispute based on construction of a fence in 1967, the Enabling Act, the 1975 [final environmental impact statement], and the 1988 hunt.

(Pls Opp. at 9). But WPI cites no authority for this position, likely because it conflicts with the construction and history of the QTA. Federal sovereign immunity provides that the United States cannot be sued without the consent of Congress. *Block*, 461 U.S. at 287. "A necessary corollary of [federal sovereign immunity] is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." *Id.* In passing the QTA, Congress intended to provide a way for claimants to challenge the United States' title to real property, and thereby created a waiver of sovereign immunity. *Id.* at 286. One "condition" to this legislation is the twelve-year statute of limitations. *Id.* at 287. Accordingly, the Court must take caution "not to interpret [the statute

---

Prop. § 345(1), (4). WPI argues that its reversionary interest was not extinguished for several reasons. (*See* Pls. Opp. at 19–24). Even if WPI's reversionary interest was extinguished between 1993 and 1996, WPI had notice of a QTA claim based on its reversionary interest by 1988, when the interest was still valid. Accordingly, the Court need not consider whether RPL 345 extinguished WPI's interest.

SA.20

of limitations] in a manner that would 'extend the waiver beyond what Congress intended.'" *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 117–118 (1979)).

If WPI's position were correct, "all of the carefully-crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted. 'It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.'" *Block*, 461 U.S. at 286 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)). Specifically, if WPI were permitted to resurrect a time-barred QTA claim involving the same disputed title, "the QTA's twelve-year statute of limitations, one point on which the Executive Branch was most insistent, could be avoided[.]" *Id.*

The Supreme Court's decision in *Block* is instructive here. *See id.* There, the Court rejected the state of North Dakota's argument that the QTA statute of limitations did not apply to civil actions brought by states. *See id.* The Court observed that "§ 2409a(f) expressly states that civil action is time-barred unless filed within twelve years after the date it accrued. The statutory language makes *no exception* for civil actions by [s]tates." *Id.* at 288 (emphasis added). The Court held that in light of its approach to sovereign immunity cases, the state was not entitled to an exemption from the QTA's statute of limitations. *See id.* Likewise here, the statutory language of the QTA makes no exception or condition for claimants seeking to resurrect time-barred title disputes due to different government conduct. *See* 28 U.S.C. § 2409a. Rather, the QTA allows a party to "adjudicate a disputed title to real property in which the United States claims an interest" within twelve years of when the United States' claim accrued. *Id.* Here, once WPI knew or should have known that its reversionary interest was triggered, the United States began

holding a claim to title that was adverse to WPI's. Particularly in light of the automatic reverter, the United States continued (and continues) to hold that adverse claim to title. While WPI had a twelve-year window of time to adjudicate that adverse claim, that window is now closed and cannot be reopened. Accordingly, given that WPI's time to bring a claim under the QTA has expired, the WPI is barred from resolving title to the WP Tracts.[13]

\*      \*      \*

Accordingly, Plaintiffs' Motion for Summary Judgment on the QTA claim is denied, Defendants' Cross Motion for Summary Judgment on the QTA claim is granted, and the QTA claim is dismissed.

II.      <u>Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief</u>

Plaintiffs assert claims for both declaratory judgment and permanent injunction, both of which are forms of relief and not independent causes of action. (SAC ¶¶ 50–54, 69–77); *see Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) (noting that the Declaratory Judgment Act "is procedural in nature, and merely offers an additional remedy to litigants"); *Roller v. Red Payments L.L.C.*, No. 19-CV-5285 (GRB) (VMS), 2022

---

[13] WPI further argues that barring this action would effectively "extinguish[] a grantor's reversionary interest for failure to bring a claim over past activity" and allow "a grantee [to] violate deed restrictions in a different manner in the future without being subject to legal challenge." (Pls Opp. at 8–9). But the QTA statute of limitations does not extinguish claimants' rights. *Block*, 461 U.S. at 292; *United States v. Gammache*, 713 F.2d 588, 591–92 (10th Cir. 1983). Rather, it bars the QTA as a remedy. *Gammache*, 713 F.2d at 591–92. In other words,

> [a] dismissal pursuant to § 2409a(g) does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits.

*Block*, 461 U.S. at 292. "Thus, once title has vested, absent eminent domain, title remains with the title holder 'regardless of whether [one's] suit to quiet its title is time-barred under [the QTA].'" *Kane Cnty., Utah (2), (3) & (4) v. United States*, No. 10-CV-01073 (CW), 2023 WL 6609358, at \*5 (D. Utah Oct. 10, 2023) (quoting *Block*, 461 U.S. at 292 & n.27). "A vested, but non-perfected property right, still means something." *Id.*



SA.22

WL 4226094, at *8 (E.D.N.Y. Sept. 12, 2022) ("[I]t is well settled that a request for injunctive relief is not a separate cause of action." (internal citation omitted)). Plaintiffs cannot maintain claims for declaratory and injunctive relief where the underlying substantive claim has been dismissed. *See Prignoli v. Bruczynski*, No. 20-CV-907 (MKB) (VMS), 2021 WL 4443895, at *13 (E.D.N.Y. Sept. 28, 2021) (holding that plaintiff is not entitled to independent declaratory relief where the court dismissed the underlying substantive claims); *Roller*, 2022 WL 4226094, at *8 ("an injunction relies on a valid legal predicate"). Thus, in light of the dismissal of Plaintiffs' underlying QTA claim, Plaintiffs are not entitled to independent declaratory or injunctive relief. Accordingly, Plaintiffs' Motion for Summary Judgment with respect to declaratory and injunctive relief is denied and Defendants' Cross Motion for Summary Judgment with respect to declaratory and injunctive relief is granted.

III.     The QTA Preempts Plaintiffs' Ejectment Claim

Plaintiffs also assert a claim for ejectment. (SAC ¶¶ 62–68). Under New York law, ejectment is an action to recover immediate possession of real property. *City of Syracuse v. Hogan*, 234 N.Y. 457, 462 (1923). To succeed on a claim for ejectment, plaintiff must prove legal title to the real property. *Aubuchon v. New York, N.H. & H.R. Co.*, 137 A.D. 834, 837 (2d Dep't 1910). Here, legal title to the WP Tracts is in dispute. And because the United States claims title to the real property at issue, the QTA is Plaintiffs' "exclusive means" to challenge title. *Block*, 461 U.S. at 286 (1983). Therefore, Plaintiffs are preempted from bringing other causes of action challenging the United States' title to the WP Tracts, including ejectment. See *id.*; *see also Shoshone-Bannock Tribes of the Fort Hall Reservation v. United States of America*, No. 18-CV-00285 (AKB), 2024 WL 249367

(D. Idaho Jan. 22, 2024) (holding that QTA prevented ejectment claim against government officer). As such, Plaintiffs' Motion for Summary Judgment on ejectment is denied, Defendants' Cross Motion for Summary Judgment on ejectment is granted, and the claim for ejectment is dismissed.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is denied, Defendants' Cross Motion for Summary Judgment is granted, and the case is dismissed.

SO ORDERED.


Hon. Ramón E. Reyes, Jr.  Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.02.26 14:01:05 -05'00'

_____
RAMÓN E. REYES, JR.
United States District Judge

Dated: February 26, 2024
Brooklyn, NY

SA.24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ANIMAL WELFARE INSTITUTE, ET AL.

                    Plaintiffs,                JUDGMENT

          v.                            17-CV-06952 (RER) (ARL)

ROMERO, ET AL.,

                    Defendants.
------------------------------------------------------------ X

       A Memorandum and Order of Honorable Ramon E. Reyes, United States District Judge,

having been filed on February 26, 2024, denying Plaintiffs' Motion for Summary Judgment;

granting Defendants' Cross Motion for Summary Judgment; and dismissing the case; it is

       ORDERED and ADJUDGED that Plaintiffs' Motion for Summary Judgment is denied;

that Defendants' Cross Motion for Summary Judgment is granted; and that the case is dismissed.

Dated: Brooklyn, NY                      Brenna B. Mahoney
       February 28, 2024              Clerk of Court


                                    By: */s/Jalitza Poveda*
                                       Deputy Clerk

**16 U.S. Code § 459e - Fire Island National Seashore**
**U.S. Code**

(a)Purposes; authorization for establishment
For the purpose of conserving and preserving for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features within Suffolk County, New York, which possess high values to the Nation as examples of unspoiled areas of great natural beauty in close proximity to large concentrations of urban population, the Secretary of the Interior is authorized to establish an area to be known as the "Fire Island National Seashore".

(b)Boundaries
The boundaries of the national seashore shall extend from the easterly boundary of the main unit of Robert Moses State Park eastward to Moriches Inlet and shall include not only Fire Island proper, but also such islands and marshlands in the Great South Bay, Bellport Bay, and Moriches Bay adjacent to Fire Island as Sexton Island, West Island, Hollins Island, Ridge Island, Pelican Island, Pattersquash Island, and Reeves Island and such other small and adjacent islands, marshlands, and wetlands as would lend themselves to contiguity and reasonable administration within the national seashore and, in addition, the waters surrounding said area to distances of one thousand feet in the Atlantic Ocean and up to four thousand feet in Great South Bay and Moriches Bay and, in addition, mainland terminal and headquarters sites, not to exceed a total of twelve acres, on the Patchogue River within Suffolk County, New York, all as delineated on a map identified as "Fire Island National Seashore", numbered OGP–0004, dated May 1978. The Secretary shall publish said map in the Federal Register, and it may also be examined in the offices of the Department of the Interior.

SA.26

**28 U.S. Code § 2409a - Real property quiet title actions**
**U.S. Code**

(a)The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands, nor does it apply to or affect actions which may be or could have been brought under sections 1346, 1347, 1491, or 2410 of this title, sections 7424, 7425, or 7426 of the Internal Revenue Code of 1986, as amended (26 U.S.C. 7424, 7425, and 7426), or section 208 of the Act of July 10, 1952 (43 U.S.C. 666).

(b)The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

(c)No preliminary injunction shall issue in any action brought under this section.

(d)The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.

(e)If the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court, the jurisdiction of the district court shall cease unless it has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by section 1346(f) of this title.

(f)A civil action against the United States under this section shall be tried by the court without a jury.

(g)Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

(h)No civil action may be maintained under this section by a State with respect to defense facilities (including land) of the United States so long as the lands at issue are being used or required by the United States for national defense purposes as determined by the head of

the Federal agency with jurisdiction over the lands involved, if it is determined that the State action was brought more than twelve years after the State knew or should have known of the claims of the United States. Upon cessation of such use or requirement, the State may dispute title to such lands pursuant to the provisions of this section. The decision of the head of the Federal agency is not subject to judicial review.

(i)Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.

(j)If a final determination in an action brought by a State under this section involving submerged or tide lands on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments is adverse to the United States and it is determined that the State's action was brought more than twelve years after the State received notice of the Federal claim to the lands, the State shall take title to the lands subject to any existing lease, easement, or right-of-way. Any compensation due with respect to such lease, easement, or right-of-way shall be determined under existing law.

(k)Notice for the purposes of the accrual of an action brought by a State under this section shall be—

(1)by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or

(2)by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

(l)For purposes of this section, the term "tide or submerged lands" means "lands beneath navigable waters" as defined in section 2 of the Submerged Lands Act (43 U.S.C. 1301).

(m)Not less than one hundred and eighty days before bringing any action under this section, a State shall notify the head of the Federal agency with jurisdiction over the lands in question of the State's intention to file suit, the basis therefor, and a description of the lands included in the suit.

(n)Nothing in this section shall be construed to permit suits against the United States based upon adverse possession.

**42 U.S. Code § 4321 - Congressional declaration of purpose**
**U.S. Code**

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**New York Consolidated Laws, Environmental Conservation Law - ENV § 11-0103. Definitions**

As used in the Fish and Wildlife Law:

10. "Hunting" means pursuing, shooting, killing or capturing (other than trapping as defined in subdivision 11) wildlife, except wildlife which has been lawfully trapped or otherwise reduced to possession, and includes all lesser acts such as disturbing, harrying or worrying, whether they result in taking or not, and every attempt to take and every act of assistance to any other person in taking or attempting to take wildlife.

11. "Trapping" means taking, killing and capturing wildlife with traps, deadfalls and other devices commonly used to take wildlife, and the shooting or killing of wildlife lawfully trapped, and includes all lesser acts such as placing, setting or staking such traps, deadfalls and other devices whether they result in taking or not, and every attempt to take and every act of assistance to any other person in taking or attempting to take wildlife with traps, deadfalls or other devices.

## CERTIFICATE OF SERVICE

I hereby certify that one ( 1 ) copy of the following:

APPELLANT'S BRIEF AND SPECIAL APPENDIX
AND APPENDIX ON APPEAL

was served upon Appellee's counsel via the Court's ECF System, as indicated, this
28th day of June, 2024, upon the following:

UNITED STATES ATTORNEY'S OFFICE FOR
THE EASTERN DISTRICT OF NEW YORK
610 Federal Plaza
Central Islip, New York 11722
 (631) 715-7879
By: James Halleron Knapp, Esq.

271 Cadman Plaza East
Brooklyn, New York 11201
By: Varuni Nelson, Esq.

Date: June  28th , 2024

/ s / Catherine Pastrikos Kelly
Catherine Pastrikos Kelly
*Attorney for Appellant*